**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Woodrow W. WISE, Jr., dba Hollywood Film Exchange, Defendant-Appellant.**

No. 76–1141.

United States Court of Appeals,
Ninth Circuit.

March 28, 1977.

Gerald M. Singer, argued, Beverly Hills, Cal., for defendant-appellant.

William D. Keller, U. S. Atty., Vincent J. Marella, argued, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS and ANDERSON, Circuit Judges, and JAMESON,* District Judge.

* Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. The indictment charged appellant with the unlawful sale of the following prints: "The Exorcist" (Count I), "Camelot" (Count III), "Forty Carats" (Count V), "Funny Girl" (Count VII), "The Sting" (Count IX), "American Graffiti" (Count XI), and "Paper Moon" (Count XIII).

JAMESON, District Judge:

Woodrow Wise, Jr. has appealed his conviction of criminal copyright infringement in violation of 17 U.S.C. § 104. He was charged in a superseding indictment with seven counts of criminal copyright infringement by willfully and for profit vending copyrighted feature-length motion pictures,[1] and also with seven counts of interstate transportation of stolen and converted property (the motion picture prints) in violation of 18 U.S.C. § 2314. Following a non-jury trial appellant was convicted on six of the seven copyright infringement counts.[2] He was sentenced to consecutive terms of one year imprisonment on each of the six counts and on condition that he serve one month on each count in a jail-type institution, the execution of the remainder of the sentence was suspended and the defendant was placed on probation for five years. The court granted defendant's motion for acquittal on the interstate transportation counts.[3]

On appeal Wise challenges the constitutionality of 17 U.S.C. §§ 27 and 104, contests the sufficiency of the evidence to sustain his conviction, and argues that his conviction is precluded by collateral estoppel. We affirm the conviction on four counts and reverse on two counts.

*Factual Background*

During the period set out in the indictment, from February to September, 1974, appellant operated a business called Hollywood Film Exchange in Los Angeles, California, which was engaged in the sale of copyrighted feature-length motion pictures, ranging in price from $95 to $575. Appel-

2. The court found appellant not guilty on Count V, charging criminal copyright infringement of the picture "Forty Carats", because it found that a "first sale" of this movie had been made.

3. The court found that the Government had failed to prove the jurisdictional requirement that the property transported had a value of $5,000 or more.

lant mailed printed lists to film collectors throughout the United States, offering approximately 349 films for sale and permitting the purchases to be charged to credit cards. Use of the films was restricted to home use in accordance with a provision on each list stating:

> "16 and 35 mm. used film for sale. Sold from one private movie collector to another for home showings only. No rights given or implied."

Sales of the films charged in the indictment were made by appellant to persons living in Michigan, Massachusetts, Georgia and North Carolina.

It was stipulated that the films were validly copyrighted by the motion picture studios which had produced them.[4] The Government called as witnesses executives and house counsel of the studios, who testified with respect to the policies and procedures of the studios in the distribution of their motion pictures. The testimony indicated that the major areas of film distribution include: theatrical (movie theaters), nontheatrical (private groups), television (both network and cable), airlines and steamships, Armed Services, V.I.P. (prominent member of the motion picture industry or community), and "studio accommodation" (interstudio lending of films for technical or casting purposes).

The studio witnesses detailed the individual distribution transactions concerning each film, and the written agreements underlying the transactions were introduced into evidence. The testimony and documents revealed that the studios generally do not sell films,[5] but rather license their use for limited purposes and for limited periods of time. The license agreements with respect to the films involved in this case generally reserved title to the films in the studios and required their return at the expiration of the license period. Many of the agreements prohibited copying of the prints. The V.I.P. licenses reserved all rights and title in the studios, restricting the licensee to possession of the print for his own personal use. None of the films had been subject to an outright sale.[6]

The Government also presented evidence that the studios sell worn-out 35 mm. film to Film Salvage Company, which reclaims the raw film stock and destroys the images thereon. Studio representatives testified that only the film stock, and not the motion picture photoplay, is sold to the salvage company. Before sending the film, the studios remove all identification from the film and send alternate reels from any one picture so that no two consecutive reels are ever sent in the same shipment, nor is a major portion of a picture sent in one shipment. Several of the studios also cut fifty foot segments off the beginning and end of each reel. Upon receipt of the film, Film Salvage chemically removes the images from those portions of the film which are suitable for use as magnetic recording tape. Other portions, suitable for use as picture leader, are cut into 200 foot sections which are spliced together (no two of the segments being from the same picture) to make 1000 foot reels, and the images on the film are obscured by a wire brush. Remaining portions of the film are ground up, melted down, and used in the plastics industry. Film Salvage then sends the studios certificates of destruction which confirm the destruction of particular film ship-

---

4. Copyrights were held by the following studios: Warner Brothers—Hoya Productions, Inc.—"The Exorcist"; Warner Brothers—Seven Arts, Inc.—"Camelot"; Universal Pictures—"The Sting", "American Graffiti"; Paramount Pictures Corp.—"Paper Moon"; Rastar Productions, Inc.—"Funny Girl"; Frankovich Productions, Inc.—"Forty Carats".

5. Cross-examination of the Government's witnesses revealed that several studios had sold films in the past. In 1954 Universal sold its

rights in four Sherlock Holmes movies to a third party. In the 1950's Warner Brothers sold its rights to all its motion pictures produced prior to 1949. There was no testimony that any sales had been made of recent motion pictures, or of the six films on which appellant was found guilty.

6. As noted *supra,* however, the district court found that a license agreement for "Forty Carats" (Count V) was in actuality a sale.

ments. Representatives of the studios and Film Salvage testified that it would be impossible, through this process, to put together a complete motion picture.[7] The vice president of Film Salvage Company testified that the company does not resell the motion picture photoplays shipped to it for destruction.

Three of the studios, Universal, Paramount and Warner Brothers, destroy old 16 mm. film in-house by physically chopping or sawing the film into small pieces, which are sent to the salvage company. Columbia disposes of its 16 mm. film in the same manner as its 35 mm. film, by shipping it to a salvage company.

On the issue of willfulness, the Government presented consent decrees in actions instituted by various studios against appellant for copyright infringement due to appellant's unauthorized sale of copyrighted motion pictures. The consent decrees issued on December 18, 1970 and January 20, 1971, among other things, enjoined appellant from selling, copying, and dealing in copyrighted feature-length films of the studios involved.

Herbert Earnshaw, the attorney for the studios who negotiated the consent decrees, testified that appellant had several discussions with him concerning appellant's background and business operation. Appellant confided to Earnshaw that he "knew that he was in trouble", that he was "doing something unlawful", and that he had been expecting some sort of action by the film companies. Appellant disclosed to Earnshaw some of the sources of supply for the motion pictures he had been selling. These sources were people who worked for film companies, whom appellant paid to steal films which were to be junked. Appellant stated that he had contacts in Washington, D. C., Boston, and Michigan who supplied him with stolen prints. At the conclusion of their discussions, Earnshaw explained to appellant that "he should not be dealing with prints that had a copyright notice on them".

The defense presented no witnesses but relied on cross-examination of the Government's witnesses in an effort to show that the studios do sell films, that some of the agreements concerning the instant films were actually sales rather than licenses, and that appellant, like any average person, did not know that what he was doing was illegal.

### Issues

(1) Is 17 U.S.C. § 104 unconstitutionally vague or overbroad?

(2) Is 17 U.S.C. § 27 unconstitutionally vague?

(3) Is the Government's prosecution barred by collateral estoppel?

(4) Was the evidence sufficient to prove that appellant willfully infringed copyrights for profit?

### Constitutionality of 17 U.S.C. § 104

17 U.S.C. § 104 provides in pertinent part:

"(a) [A]ny person who willfully and for profit shall infringe any copyright secured by this title, or who shall knowingly and willfully aid or abet such infringement, shall be deemed guilty of a misdemeanor . . . ."

Appellant contends that the statute is unconstitutionally vague because it fails to define the word "infringe" and fails to give notice that "vending" copyrighted material constitutes infringement. The Government replies that § 104 is sufficiently certain when considered in the context of Title 17, which provides the statutory scheme for copyright law. We agree.

Section 1 of Title 17 enumerates the rights of the copyright holder, which include the rights "to print, reprint, publish, copy, and *vend* the copyright work . . . ." [Emphasis added.] Section 5 specifies the types of property subject to

---

7. The average feature-length 35 mm. motion picture ranges in length from 11,000 to 14,000 feet.

copyright protection, including "motion picture photoplays". As the Government argues, it is clear that any act which is inconsistent with the exclusive rights of the copyright holder, as enumerated in § 1, constitutes infringement.

 The concept of vagueness is rooted in a "rough idea of fairness", *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) and requires "that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly". *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The standard of specificity required of a penal statute was enunciated in *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952):

> "A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation. But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."

This court has said: "A statute meets the standard of certainty required by the Constitution if its language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Turf Center, Inc. v. United States,* 325 F.2d 793, 795 (9 Cir. 1963).

██ We find that § 104 satisfies these standards of certainty. Viewed in a common sense manner and in the context of the copyright statutory scheme, the statute is sufficient to put one on notice that the unauthorized vending of copyrighted works constitutes infringement. The court in *United States v. Wells,* 176 F.Supp. 630, 633 (S.D.Tex.1959) was of a similar view:

> ". . . To gain any idea of its [§ 104] coverage or of the protection afforded by the copyright law one must resort to the civil law of copyright and to the provisions of Title 17 as a whole. The basic question of interpretation involved in Section 104 is the meaning of infringement of copyright. Although there is no statutory definition of infringement of copyright, it may be readily inferred from the provisions of Title 17 United States Code § 1(a), conferring upon the copyright proprietor the exclusive right to print, reprint, publish, copy and *vend* the copyrighted work. [Emphasis supplied]. The grant of these exclusive rights implies the prohibition that others shall not exercise them without the consent of the copyright proprietor; to do so without such consent would be infringement of copyright." [8]

██ Further, the statute requires a willful violation, which undercuts any claim of lack of warning or fair notice of the criminal sanctions. *Screws v. United States,* 325 U.S. 91, 101–103, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). We conclude that § 104 is not unconstitutionally vague.

 Appellant additionally challenges the statute as overbroad because it prohibits vending, as well as copying, copyrighted material. This argument misperceives the nature of the overbreadth doctrine which focuses on the potential application of a statute to constitutionally protected conduct. See *Grayned v. City of Rockford,* 408 U.S. at 114, 92 S.Ct. 2294. The vending of copyrighted material even when done with proper authorization, is not behavior subject

---

**8.** See also *United States v. Taxe,* 540 F.2d 961, 965 (9 Cir. 1976), where the court held that while the word "duplication" used in 17 U.S.C. § 1(f) was not statutorily defined, the statutory language was not unconstitutionally vague when read in the context of the entire statute.

to constitutional protection. Consequently, § 104 is not subject to attack on grounds of overbreadth. We hold that the statute is constitutional.

### Constitutionality of 17 U.S.C. § 27

█ While the copyright laws protect the right of the copyright proprietor to vend his work, that right is not absolute, but is subject to the "first sale doctrine" as stated in 17 U.S.C. § 27. That statute provides in pertinent part:

"[B]ut nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

█ Although the statute speaks in terms of a transfer of possession, the judicial gloss on the statute requires a transfer of title before a "first sale" can occur. Thus, the first sale doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy. While the proprietor's other copyright rights (reprinting, copying, etc.) remain unimpaired, the exclusive right to vend the transferred copy rests with the vendee,[9] who is not restricted by statute from further transfers of that copy, even though in breach of an agreement restricting its sale.[10] See *Harrison v. Maynard, Merrill & Co.,* 61 F. 689, 691 (2 Cir. 1894).

█ Appellant contends that § 27 is unconstitutionally vague because it requires judicial construction to make its meaning clear. It is well settled, however, that "[i]f

a judicial explication makes a statute clear, so that fair notice is afforded, vagueness may not be imputed". *United States v. Fithian,* 452 F.2d 505, 506 n. 1 (9 Cir. 1971), citing, inter alia, *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). Section 27 has consistently been construed to require a transfer of title rather than mere possession. *Harrison v. Maynard, Merrill & Co., supra; Platt & Munk, Inc. v. Republic Graphics, Inc.,* 315 F.2d 847 (2 Cir. 1963).[11] The judicial gloss on § 27 provides clear notice of its application, and precludes any claim that it is unconstitutionally vague.

### Collateral Estoppel

Appellant next contends that his prosecution is barred by the doctrine of collateral estoppel, on the basis that previous film piracy cases [12] have found studio transactions with motion pictures to be "first sales". Appellant asserts that these cases are dispositive here and that any factual differences between the cases are "only as to such non-material points as the particular film titles or the identities of purchasers and parties". These so-called "non-material points" are, however, precisely the elements upon which collateral estoppel depends, and upon which appellant's argument must fail.

█ Collateral estoppel, although first developed in civil litigation, is embodied in the Fifth Amendment guarantee against double jeopardy. "It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any further lawsuit." *Ashe v. Swenson,* 397 U.S.

---

**9.** This results because the copyright is distinct from the property which is copyrighted, and the sale of one does not constitute a transfer of the other. See 17 U.S.C. § 27. Upon the sale of a copyrighted work, the vendee is endowed with the ordinary incidents of ownership, including the right of alienation.

**10.** If the vendee breaches an agreement not to sell the copy, he may be liable for the breach but he is not guilty of infringement.

**11.** In *Platt & Munk,* it was contended that under § 27 the defendants acquired not merely

possession but title as well. In holding that "[s]uch a literal reading of the 'but nothing' clause is unacceptable", Judge Friendly carefully analyzed the provisions of § 27 and its legislative history. 315 F.2d at 851–854.

**12.** *American International Pictures, Inc. v. Foreman,* 400 F.Supp. 928 (S.D.Ala.1975); *United States v. Nagy,* (unreported) (N.D.Ind. 1975).

**1188**

436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). The two central requirements of collateral estoppel—identity of issues and identity of parties—are absent here. Appellant was not a party in either of the prior cases upon which he relies.[13] Nor did those cases involve the same films or the same contractual agreements. This case involves an entirely separate factual issue (appellant's guilt of infringing the copyrights on these particular films) between entirely separate parties.

### Sufficiency of Evidence

Preliminary to a discussion of the evidence in this case, we consider the elements necessary to sustain a conviction of criminal copyright infringement and the Government's burden of proof. We find only two reported cases involving criminal copyright infringement in violation of § 17 U.S.C. § 104—*United States v. Wells, supra,* and *United States v. Bily,* 406 F.Supp. 726 (E.D. Pa.1975).

In *Wells* the court granted defendant's motion for acquittal on eight counts of criminal infringement of the copyright of aerial survey maps owned by Edgar Tobin. Tobin had licensed 107 of his customers to manufacture reproductions of his maps for their own use. Defendant was charged with selling, without authorization, copies of Tobin's copyrighted maps. The pivotal issue was whether the copies sold by the defendant were copies which had been the subject of a first sale, thereby terminating their statutory protection:

". . . If title has been retained by the copyright proprietor, the copy remains under the protection of the copyright law, and infringement proceedings may be had against all subsequent possessors of the copy who interfere with the copyright proprietor's exclusive right to vend the copyrighted work. If title has passed to a first purchaser, though, the copy loses the protection of the copyright law as discussed above." 176 F.Supp. at 633–634.

The court found that "there has been no showing on the record that the copies of the aerial survey maps were not published by a lawful licensee of the copyright proprietor or that title to these copies was retained at all times by the copyright proprietor". 176 F.Supp. at 633. Since the Tobin license did not specify that title to the reproduced maps was to remain in Tobin, title to the maps belonged to the licensees who, under the first sale doctrine, were free to resell the maps. The court concluded: "Lacking the protection of the copyright law, there can be no infringement, and defendant should be acquitted." 176 F.Supp. at 634.

 *Bily* concerned the issue of probable cause for the issuance of a search warrant for defendant's house and garage, pursuant to which numerous reels of motion picture film were seized, leading to defendant's indictment for criminal copyright infringement. In holding that the Government had failed to show probable cause for the issuance of the warrant, the court considered the elements necessary for conviction under 17 U.S.C. § 104, and the Government's burden in proving those elements:

"The government has to carry several burdens to convict this defendant under 17 U.S.C. § 102 [sic—§ 104]—it must show infringement, that the infringement was willful, and that it was engaged in for profit. Moreover, each element of the crime must be proven beyond a reasonable doubt." 406 F.Supp. at 733.

To prove infringement by vending, the Government must also prove the absence of a first sale as to those articles sold by the defendant.[14] And, since "[c]opyright pro-

---

**13.** The *Foreman* case was not even a criminal prosecution, but rather a civil action for infringement.

**14.** In *American International Pictures, Inc. v. Foreman, supra,* the court held "that the non-occurrence of a 'first sale' is part and parcel of the second element of a plaintiff's infringement

action, i. e., vending by the defendant, and that therefore a plaintiff must bear the burden of proof with respect to it". 400 F.Supp. at 933. Although a civil case, *Foreman's* conclusion was adopted in *Bily,* 406 F.Supp. at 730, in accordance with the general principle in copyright law of looking to civil authority for guidance in criminal cases.

prietors frequently transfer rights in their works by complicated agreements which cannot simply be called 'sales'[,] [i]n each case, the court must analyze the arrangement at issue and decide whether it should be considered a first sale." 406 F.Supp. at 731.

The question of what constitutes a first sale has been considered in a number of cases, although none of them are precisely in point factually. In *Hampton v. Paramount Pictures Corporation*, 9 Cir., 279 F.2d 100 (1960), *cert. denied*, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960), this court determined that a transaction was a "license" and not an "assignment" in a civil action for copyright infringement. Paramount's suit against Hampton was predicated on Hampton's unauthorized public exhibition of the silent movie "The Covered Wagon", which he had purchased from Kodascope Libraries, Inc. Kodascope had been licensed by the copyright predecessor of Paramount "to product prints of certain films [including 'The Covered Wagon'] for non-theatrical exhibitions". In affirming the lower court injunction, this court found that the agreement between Paramount's predecessor and Kodascope was a restricted license. In arguing that the agreement was in fact an assignment of the right to exhibit the films, after which the assignor (Kodascope's predecessor) lost all "power to restrict the use of the picture",[15] Hampton pointed to these provisions of the agreement:

"the contract contains no limitation as to time; a flat lump-sum payment was to be made for each film transferred; there was no requirement that outstanding prints and negatives were to be returned; no limitation was placed on the right to alter or abridge the films transferred; and the contract gave Kodascope exclusive territorial rights coextensive with the rights of Paramount." 279 F.2d at 103.

But the court found the agreement on its face to be clearly a license, thereby "precluding a construction that there was an assignment". Moreover, the purpose of the license was to allow Kodascope "to make reproductions of the photoplays 'and to license the use thereof . . .'", thereby precluding a construction that Paramount gave Kodascope the right to sell the reproductions. The court concluded that Hampton had infringed Paramount's copyright by his unauthorized public exhibition of the movie because "[w]hile Kodascope may have purported to unconditionally sell a positive print, its only authority from Paramount was to reproduce miniature [16 mm] prints and license them for non-theatrical use". 279 F.2d at 103.

Appellant relies primarily on *Harrison v. Maynard, Merrill & Co.*, 61 F. 689 (2 Cir. 1894) and *Independent News Co. v. Williams*, 293 F.2d 510 (3 Cir. 1961). In *Harrison*, a publishing company which owned the copyright on a book entitled "Introductory Language Work" habitually stored printed and unbound sheets of the book with a bindery. Following a fire, the unbound sheets and some bound volumes were sold for waste paper with a restriction that they not be "placed on the market as anything else". Subsequently a quantity of damaged copies of "Introductory Language Work" appeared on the market, being offered for sale by the defendant. The district court granted plaintiff's motion for an injunction to restrain defendant's alleged copyright infringement. On appeal, the Second Circuit set aside the injunction, finding that the sale of the unbound pages for salvage was a "first sale", terminating copyright protection for further sales of the material, even though the first sale had been in breach of contract.

In *Independent News*, plaintiffs, the distributor, publisher, and copyright owner of comic books, sought to enjoin the defendant, a second-hand periodical dealer, from selling comics which plaintiff's wholesaler had sold for scrap to waste paper dealers, who in turn resold them to defendant. In upholding the district court's denial of the injunction, the Third Circuit found, *inter alia*, that defendant's sale of the comics did

---

**15.** This definition of assignment appears to be equivalent to the definition of a sale.

not constitute copyright infringement since plaintiffs had engaged in a first sale of the comics. The court so held even though there was a contract between the distributor and the wholesaler that the wholesaler would dispose of the comics "for no other purpose than waste paper".

It is clear that the Government's burden of proof of criminal copyright infringement is threefold: (1) infringement of a copyright (2) done willfully and (3) for profit. Implicit in its burden of proof on infringement by vending is the duty to prove the absence of a first sale as to those copyrighted articles which the defendant is charged with infringing. What constitutes a "first sale" presents a more difficult question.

### A. *Infringement*

Appellant contends (1) that the license agreements for the exhibition of the films and V.I.P. loan agreements were in reality sales of the films, and (2) that each of the photoplays had been sold to salvage companies. Based on these contentions, the crux of appellant's argument is his speculation that the prints could have come from a legitimate source. The Government contends that the various agreements were what they purported to be and were not sales. Upon our review of the record, we find the Government's position to be correct, subject to the exceptions hereafter discussed.

### 1. *License Agreements*

The films were distributed by the studios in the major areas of distribution pursuant to agreements termed "licenses", granting the licensees limited rights of exhibition or distribution. The Government presented detailed evidence on each transaction involving each film, and all the written license agreements were admitted into evidence. Typical of the license provisions is the following taken from a theatrical license agreement:

> "The Distributor grants the Exhibitor and the Exhibitor accepts a limited license under the respective copyrights of the motion picture . . . to exhibit said motion picture."

The evidence was presented through testimony of studio representatives knowledgeable about the film distribution system and related to the specific films involved in the alleged infringement.[16] We now proceed to analyze these transactions to determine whether, in legal effect, any of them may be considered sales.

Typical of the evidence presented was that relating to the transactions of Universal Pictures with respect to "The Sting" (Count IX) and "American Graffiti" (Count XI). These movies were licensed by Universal for theatrical distribution, nontheatrical distribution, distribution to the U.S. Navy, Army and Air Force, and distribution to steamships and hotels. All but the Armed Services contracts were designated as "licenses", and all purported to transfer only limited rights for the exhibition or distribution of the films for a limited purpose and for a limited period of time. The agreements reserved title to the film prints in Universal, and required their return to Universal following the expiration of the contract term. All but the hotel distribution agreement also prohibited the licensee or any other party from copying or duplicating any film prints. In accordance with the holding and reasoning of *Hampton v. Paramount Pictures Corporation, supra,* we find that none of these agreements constituted first sales, since both on their face and by their terms they were restricted licenses and not sales.[17]

---

**16.** We do not have the problem of the quality of plaintiff's proof which was faced by the court in *American International Pictures, Inc. v. Foreman, supra.* The court there found that the plaintiffs had failed to prove infringement of their copyrights by a preponderance of the evidence because "the [plaintiffs'] testimony consisted primarily of generalities and there were significant gaps in the experience and knowledge of each of the plaintiffs' witnesses. No comprehensive system of accountability for the control of plaintiffs' motion picture prints was ever established by the plaintiffs' evidence." 400 F.Supp. at 934.

**17.** To the extent that *Hampton* may be in conflict with *Wells* and other cases *supra* with

Without detailing each of the specific transactions, it is clear that most of the agreements pertaining to the other films, which were received in evidence. Likewise constituted licenses rather than sales.[18] Although some of the contracts did not provide expressly for reservation of title in the copyright owner, the remaining terms of the agreements were consistent with the theory of a limited license and inconsistent with the concept of a sale. The mere failure to expressly reserve title to the films does not require a finding that the films were sold, where the general tenor of the entire agreement is inconsistent with such a conclusion.

Two agreements, however, require special consideration. The first is an agreement between Warner Brothers—Seven Arts and National Broadcasting Company (NBC) licensing NBC to telecast "Camelot" (Count III) on "free television". Of concern is a provision allowing NBC to order "at its expense" from Warner "such additional prints or negative elements as NBC may reasonably require" in connection with the telecast of "Camelot" and another provision reading in part:

> "Licensor may *buy* from NBC, at such price as the parties may mutually agree, prints made at NBC's expense; as to any prints for which no agreement in price is reached within thirty (30) days after NBC's notice of availability to Licensor, NBC shall destroy such prints and furnish a certificate of destruction." (Emphasis added.) [Ex. 16, ¶ 9, p. 11]

Appellant contends that these provisions indicate "the presence of a 'sale' at least as would satisfy § 27". However, Bernard

Sorkin, chief counsel for Warner Distributing Corporation, testified that prints were not sold under this contract and that paragraph nine merely allows Warner to compensate NBC for the out-of-pocket cost of prints produced at NBC's expense. This interpretation of the provision appears correct, as indicated by the language which immediately follows that previously quoted:

> "Title to all prints and tapes shall be and remain in Licensor [Warner] subject to the rights granted to NBC under this agreement."

We find this language and the entire contract to be a license and not a sale.

The second agreement is one between American Broadcasting Company (ABC) and Screen Gems, a division of Columbia Pictures Industries, Inc., granting ABC the right to televise "Funny Girl" (Count VII) on free television. This agreement, which is not phrased in terms of a license, has a provision in paragraph 9(c) for the return of prints similar to that of the NBC contract, except that no provision is made for the retention of title to the prints in Screen Gems.[19] In addition, a portion of paragraph 9(a) states that: "At ABC's election and cost a file-screening copy shall be retained, notwithstanding subparagraph 9(c)."[20] [Ex. 32] Paragraph 9(c), in failing to provide for the retention of title, approaches a sale-and-buy-back situation. We need not so hold, however, since paragraph 9(a) clearly contemplates the sale of a film print to ABC at ABC's election. No evidence was adduced at trial as to whether ABC exercised its election, or, if it did, whether it resold that print. In the absence of such proof, the Government has failed in

respect to the meaning of "first sale" we adhere to the reasoning of *Hampton*.

**18.** On this basis this case is factually distinguishable from *United States v. Wells, supra*, where there was evidence that the copyright holder had sold copies of the copyrighted work to his customers. Since sales had been made it was incumbent upon the Government to trace the films sold.

**19.** Paragraph 9(c) of the agreement provides:

"Promptly after expiration of the Authorized Broadcast Period ABC shall offer to Licensor, in 'as is' condition, all prints of the Film and other reasonably available material ABC has theretofore ordered at ABC's cost, at a price to be negotiated or, failing agreement between the parties on such price, ABC shall destroy said prints or other material, and ABC will supply Licensor with evidence of such destruction." [Ex. 32, p. 7]

**20.** No restriction on the use or further resale of such a copy is provided in the contract.

its burden of proving the absence of first sale of the photoplay "Funny Girl".[21] Accordingly, appellant's conviction on Count VII must be reversed.

## 2. *V.I.P. Contracts*

■ Studio representatives testified that film prints are loaned to actors of major stature on rare occasions, pursuant to V.I.P. agreements which restrict the use of the prints to personal use. No charge is made for the use of the print, other than an occasional charge to reimburse the studio for the cost of making the print.

V.I.P. agreements were made with respect to the photoplays "The Sting", "Camelot", "Paper Moon", and "Funny Girl". The agreement pertaining to "The Sting", made with Robert Redford, George Ray Hill, and the Summa Corporation, granted a "revocable, nonexclusive consent" to use the print and retained title to the print in Universal Pictures. [Ex. 9] "Paper Moon" was "loaned" to Peter Bogdonavich pursuant to an agreement in which Paramount Pictures retained title to the print and required its return upon the request of Paramount. [Ex. 24] The movie "Funny Girl" was furnished to Barbra Streisand, Ray Stark, and William Wyler under an agreement which reserved to Columbia "all rights in, to and with respect to" the film, "subject to such limited rights" as were granted to the V.I.P's by the agreement—which consisted of the right to privately exhibit the film at the residence of the V.I.P. [Exs. 35, 35A, 35B] All of these agreements required the licensee to retain the film print in his possession at all times and prohibited him from copying or duplicating it. We find the terms of these agreements to be consistent with their designation as loans or licenses, and that they do not effect sales of the motion pictures.

■ The terms of an agreement whereby Warner Brothers furnished a print of "Camelot" to Vanessa Redgrave were substantially different. That agreement provided:

"1. You will pay us our cost for said print (i. e., the sum of $401.59).

"2. Said print is furnished you for your personal use and enjoyment and shall be retained in your possession at all times; said print shall not be sold, leased, licensed or loaned by you to any other person and shall not be reproduced in any size or type prints, or otherwise; and said print shall not be exhibited by you publicly for profit, paid admissions or otherwise, but the use of said print by you shall be confined to private home showings and library purposes." [Ex. 18]

While the provision for payment for the cost of the film, standing alone, does not establish a sale, when taken with the rest of the language of the agreement, it reveals a transaction strongly resembling a sale with restrictions on the use of the print. No evidence was presented with respect to the whereabouts of the print furnished to Vanessa Redgrave. In the absence of such proof we conclude that the Government has failed to carry its burden of showing that there was no first sale. Accordingly we reverse the conviction on Count III.

## 3. *Salvage*

Representatives of each of the studios testified that their companies sell worn-out 35 mm. film to salvage companies for recovery of the raw film stock.[22] All of the studios sold their old 35 mm. film to Film Salvage Company. 16 mm. film was destroyed in-house by all of the studios except Columbia, which sold its scrap 16 mm. film to Stan's Reclaiming Service, which followed procedures similar to Film Salvage

---

**21.** We reach this conclusion in spite of the testimony of Jerome Gottlieb, an employee of the Business Affairs Department of Columbia Pictures Television Division, who testified that to his knowledge Columbia had never sold prints of "Funny Girl" to any of the television

networks. [Tr. 763] This testimony is inconsistent with the plain meaning of the language in the contract between Screen Gems and ABC.

**22.** The agreements between the studios and the salvage companies are generally oral.

Company in disposing of it. The studio representatives testified that they sell only the film base and not the motion picture photoplay.

With respect to the general practice followed by the studios in the sale of film for salvage, it was established that Film Salvage Company destroys the photoplays and does not resell them. The executive vice-president of Film Salvage, Larry Stultz, testified that his company destroys the images on "junk film" by either washing, burning, or wire brushing the film base. Film Salvage then issues certificates of destruction to the studios certifying that the photoplays on the film have been destroyed. [Tr. 855]

Film which is of good quality is used to make "picture leader", film with part of the images left on, which is used as leader on other film reels. Picture leader is sold in rolls of 1000 feet, which are made by splicing together film segments 200 feet or less in length, taken from various reels of film. No two pieces of spliced film come from the same motion picture. [Tr. 852] As the film is spliced onto the reel, it is also brushed with a wire brush, severely obscuring the images thereon.[23] [Tr. 851] Other portions of film are washed, removing the images, and are used for magnetic recording tape. Black and white film is burned to recover the silver on the film. Unuseable color film is ground into chips and sold to the plastics industry. Stultz testified that in no case does his company ever resell full-length motion pictures. [Tr. 856] His testimony about the salvage operation, which was unrebutted by appellant, established that it would be impossible to piece together a feature-length motion picture from the products sold by Film Salvage Company.[24]

Relying on *Harrison v. Maynard, Merrill & Co., supra,* and *Independent News Co. v. Williams, supra,* appellant contends that the transfer of title to a copyrighted article, even if only for purposes of salvage, is a first sale under the copyright laws. The Government argues that the studios sell only the film and not the copyright photoplay to the salvage company, and that it was established by the evidence that no print of the films here involved had been sold for salvage.

■■■■ Assuming, as appellant argues, that a photoplay cannot exist independent of the film upon which it is depicted, there would of course be a "first sale" of any film sold for salvage. This does not help appellant, however, because the evidence in this case proved that the prints which are sold for salvage cannot be pieced together to produce a copy of the film. The Government established that Film Salvage Company destroyed the photoplays and did not resell them. The "first sale" doctrine is applicable only with respect to the copyrighted article which the vendee is charged with infringing. We conclude that even if prints of the photoplays involved in this case were sold for salvage, the Government's evidence proved beyond a reasonable doubt that the prints sold by appellant were not films which had been sold for salvage.

### 4. Application of First Sale Doctrine

On the crucial issue of whether there was a "first sale", the district court in finding appellant guilty on five of the six counts, said in part:

"Now, we look in vain here, it seems to me, for any application of the first sale doctrine which is found in 17 U.S.Code

---

**23.** Some portion of the images is left on the film so that the side of the film with the emulsion on it can be identified.

**24.** Appellant's argument that there was evidence to the contrary apparently is based upon evidence in the case of *United States v. Drebin,* C.A. 75–3475 (9 Cir. filed February 19, 1975), another "film piracy" prosecution. While counsel for appellant continually referred to that testimony in his cross-examination of Stultz and other Government witnesses, it was not introduced into evidence in this case and may not properly be considered as proof. Moreover, it is clear that the district court accepted the testimony of Stultz and other Government witnesses.

Section 1727, [sic] or any first sale transaction, because all of the evidence before the Court—and, of course, all of the reasonable inferences to be drawn from the evidence—makes it absolutely clear beyond any reasonable doubt that there was no first sale of any of the five pictures mentioned in Counts One, Three, Seven, Nine, Eleven and Thirteen." [25] [Tr. 1243]

As noted *supra*, the district court did find that there was a first sale of "Forty Carats" and accordingly found appellant not guilty on Count V. We have concluded that the Government fails to establish an absence of a "first sale" with respect to "Funny Girl", Count VII, and "Camelot", Count III. We agree with the District Court that with respect to Counts I, IX, XI and XIII the Government sustained its burden of proving the absence of a first sale.

### B. *Willfulness*

[28, 29] We agree with appellant that the Government had the burden to prove, in addition to the usual requirement of an act intentionally done in violation of the law, that appellant knew that the film which he sold had not been first sold by the copyright owner. From a review of the record we are satisfied that the Government sustained this burden.

As set forth in the statement of facts, on December 18, 1970 and January 20, 1971 appellant consented in writing to the entry of decrees in actions brought by various movie studios. [26] The decrees enjoined him from selling, copying, and dealing in copyrighted feature-length films of the studios involved.

The attorney who represented the studios testified at length regarding several conversations with Wise, in which Wise said he had been involved in the movie business "all of his life", that he expected some action to be taken by the studios against him, and that he "knew that those prints were only sent out on license and they had to be returned . . .." He told the attorney that he had two sources of supply for the prints he sold: (1) employees of film companies who stole prints and sold them, and (2) other film dealers. At the time Wise signed the consent decrees the attorney told him "that he should not be dealing with prints that had a copyright notice on them".

The Government also presented evidence that when Wise became aware that he was being investigated by the F.B.I. in this case, he sent a letter to many of his customers informing them that he was under investigation and instructing them to "be careful". He told the customers not to talk to the F.B.I. and "for your own protection get all films out of your house and into a safe place that no one knows about until things cool off". In closing he said, "for yours and my own protection please destroy this letter right away". [27]

The reasonable inference to be drawn from this is that appellant knew that films,

---

**25.** This court does not have the benefit of specific findings of fact and conclusions of law of the district court. The trial judge stated at the outset of the trial that he would not try the case without a jury unless the defendant would waive his right to request special findings pursuant to Rule 23(c), F.R.Crim.P. The defendant consented in writing to both the waiver of a jury trial and the request for special findings under Rules 23(a) and (c). While the court did not make formal findings of fact and conclusions of law, it did comment on the evidence in open court in finding the defendant guilty.

**26.** The studios involved were Twentieth Century Fox Film Corp., United Artists Corp., Columbia Pictures Industries, Inc., Universal City Studios, Inc., Warner Bros. Inc., Walt Disney Productions, Metro-Goldwyn-Mayer, Inc., and Paramount Pictures Corp.

**27.** Appellant attacks the credibility of the witness Earnshaw, attorney for the studios in the prior cases. The district court, however, in discussing the proof with respect to the required element of "willfulness", referred to the letter appellant wrote "to his customers about the F.B.I., but more particularly the testimony of the witness Earnshaw. I must say that he impressed me very much. I think he was honest in telling us what Mr. Wise said.

"And therefore, from that, we have to conclude that his actions were willful, and he knew what he was doing and did it with a bad purpose to disobey the law or disregard the law, and that he had the specific intent."

unlike other copyrighted works such as books, phonograph records, and sheet music, are not generally sold but are licensed for exhibition. Although appellant produced evidence of several sales of films by studios, they were films which had been produced many years ago and were not recent box-office attractions, which are generally not sold until all readily obtainable license revenue has been extracted from them.

It is further reasonably inferable that appellant maintained his illegal sources of supply for films after the prior infringement suits, particularly in light of the Government's evidence that, with the exceptions discussed previously, none of the films *sub judice* had been the subject of a first sale. Such illicitly obtained films are not subject to first sale insulation from suit, of which appellant must have been aware. The trial judge could properly find that the Government established the element of willfulness beyond a reasonable doubt.

### C. *Profit*

We find no merit in appellant's final contention that the Government failed to prove that he infringed the copyright for profit. He had a substantial business, regularly mailed out circulars listing films for sale, and permitted customers to charge their purchases to major credit cards. Checks made payable to appellant were received in evidence. Appellant argues that the Government must prove that he actually made a profit, and that because the checks were made payable to him personally and not to his business he was operating privately and not as a business seeking profit. The district court found that the profit element had been proven, stating

that "for profit doesn't mean whether or not the person actually makes a profit, but whether or not he is engaged in a business to hopefully or possibly make a profit." [Tr. p. 1245]

We agree with the district court and reject both of appellant's arguments. As the court said in *United States v. Taxe*, 380 F.Supp. 1010, 1018 (C.D.Cal.1974), *aff'd* 540 F.2d 961 (9 Cir. 1976):

> " 'Profit' includes the sale or exchange of the infringing work for something for value in the hope of some pecuniary gain. It is irrelevant whether the hope of gain was realized or not. The requirement of profit is intended to delineate commercial infringements from infringements for merely personal use and philanthropic infringements."

The question of what name appeared on the checks used to purchase the films is likewise irrelevant. Appellant, whether personally or through his business, was clearly selling films with the expectation of making a profit.

The judgment of the district court is affirmed as to Counts I, IX, XI and XIII and reversed as to Counts III and VII.