**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Lee William SACHS, Defendant-Appellant.**

**No. 86–1021.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 4, 1986.

Decided Sept. 23, 1986.

---

Kenneth Haber, Asst. U.S. Atty., Detroit, Mich., Patricia G. Blake (argued), for plaintiff-appellee.

James A. Callahan (argued), Barbier, Goulet, Petersmarck, Tolleson, Mead & Paige, P.C., Detroit, Mich., for defendant-appellant.

Before KEITH and MERRITT, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Defendant-Appellant Lee William Sachs appeals from a jury verdict finding him guilty of aiding and abetting in the infringement of copyrights in motion pictures in violation of 17 U.S.C. §§ 106(3), 506(a) and 18 U.S.C. § 2(a), and guilty of conspiring to infringe copyrights in motion pictures in violation of 18 U.S.C. § 371 and 17 U.S.C. § 506(a). For the reasons set forth below, we affirm the convictions.

## I.

In April 1979, a five-count indictment was issued against defendant Sachs and co-defendant Irving Stollman. The indictment alleged that Sachs and Stollman, and others unknown, had conspired to infringe copyrights in motion pictures from December 1, 1977 to November 14, 1978. It further alleged that Sachs and Stollman specifically infringed the copyrights of three movies: "Smokey and the Bandit," "Shampoo" and "Blazing Saddles." A jury trial was not conducted until September 1985, however, because appellant Sachs had taken up residence in Florida under a different name and was not discovered until sometime in 1985. In the meantime, the charges against co-defendant Stollman were dis-missed. The following facts were adduced at trial.

FBI agent James Owens arranged to meet with the defendant on November 11, 1978 to discuss purchasing videotaped movies. Agent Owens was working undercover as part of an investigation into the manufacture of "pirate" movies, using the name Rubin Stern. Stollman picked up Owens at a hotel and drove him to an apartment which contained numerous pieces of equipment used for recording and duplicating videotapes as well as "master tapes" [1] on ¾-inch tape and boxes of blank video cassette tapes. Defendant Lee Sachs was present at the apartment.

Defendant then provided agent Owens with a list of movies for sale. Owens first ordered three films, "Smokey and the Bandit," "Shampoo" and "Blazing Saddles." These films were to be ready the next day for a price of $60 each. Owens then told Sachs, as part of a cover-up story, that he was hoping to purchase 50 to 100 movies per week for export to the Middle East. As a result, Owens reached a second agreement with Sachs to purchase 20 or 30 additional movies, on a trial basis, for this imaginary export business. He testified that the defendant told him that it would take approximately one week "to duplicate" that number of films. Owens gave Sachs a $1500 check as a deposit for the large order.

Owens returned to the same apartment on the following day to pick up the films he had initially ordered, giving Sachs $260 in cash. In exchange, Owens received copies of the film on video cassette tape and a receipt for this purchase signed by Sachs in Owens' presence.

On November 14, 1978, FBI agents seized many items from Sachs' apartment pursuant to a search warrant based on Owens' undercover work.[2] Sachs was ar-

---

1. Owens testified that "master tapes" are "tapes which have been made from the original source of a motion picture." These are the tapes from which other copies are made.

2. These items included master tapes of "Shampoo" and "Blazing Saddles," thirteen boxes of video cassette tapes, business records, blank sales slips, business cards stating defendant Sachs was president of "Video Graphics, Inc.," and equipment used in recording, duplicating or playing both ¾-inch and cassette film.

rested in Florida six years later following a domestic dispute with Karyn Rose, the woman he had been living with. At that time, Sachs was using a different name and was carrying different documents containing false identification. Karyn Rose testified that Sachs had said he used false identification because he was a "felon."

The jury returned a verdict on December 13, 1985, finding Sachs guilty on each of the substantive counts as well as the conspiracy count. The defendant raises several issues on appeal.

## II.

### A. "FIRST SALE"

As his initial assignment of error, the defendant asserts that there was insufficient evidence to convict him of the charged offenses. In particular, the defendant argues that the goverment failed to meet its burden of proving that the particular films purchased by Owens had not been the subject of a "first sale." In order to address the merits of this argument, we must review the "first sale" doctrine and relevant statutory provisions.

Under 17 U.S.C. § 106(3), the owner of a copyright has the exclusive right to "distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending...." 17 U.S.C. § 506(a) establishes a criminal offense for "[a]ny person who infringes a copyright willfully and for purposes of commercial advantage or private financial gain...." 17 U.S.C. § 501 provides that an individual is an "infringer" if he "violates any of the exclusive rights of the copyright owner...." Therefore, an individual who duplicates and sells for profit a copyrighted work which he does not own is infringing on the copyright owner's exclusive rights. In the instant case, the defendant was charged with infringing copyrighted works by distributing by sale copies of the copyrighted motion pictures.

Implicit in the act of "infringement," is the requirement that the particular copy of the copyrighted work be an unauthorized or illegally obtained copy. In other words, the law does not forbid an individual from selling, or otherwise transferring, a copy of a copyrighted work which was lawfully obtained or lawfully manufactured by that individual. If the copyright owner has given up title to a copy of a work, the owner no longer has exclusive rights with respect to that copy. This is known as the "first sale doctrine," which was originally contained in 17 U.S.C. § 27, see United States v. Powell, 701 F.2d 70, 72 (8th Cir.1983), and has since become a "judicial gloss" on the criminal liability provisions for copyright infringement. United States v. Atherton, 561 F.2d 747, 750 (9th Cir.1977).

The Ninth Circuit has held that the government has the burden, as part of its burden of proving the defendant guilty beyond a reasonable doubt, of establishing that the copy which the defendant distributed was not subject to a first sale; i.e., that the defendant did not, in fact, distribute a lawfully obtained copy. See United States v. Moore, 604 F.2d 1228, 1232–33 (9th Cir.1979); Atherton, 561 F.2d at 750; United States v. Wise, 550 F.2d 1180, 1188–91 (9th Cir.), cert. denied, 434 U.S. 929, 98 S.Ct. 416, 54 L.Ed.2d 290 (1977). Some courts appear to have characterized the "first sale" doctrine as a defense, however, rather than as a burden initially carried by the government. See United States v. Drum, 733 F.2d 1503, 1507 (11th Cir.), cert. denied, sub nom., McCullock v. U.S., 469 U.S. 1061, 105 S.Ct. 543, 83 L.Ed.2d 431 (1984); Powell, 701 F.2d at 72–73. Although we conclude that it is more logical to view the first sale doctrine as an implied governmental burden since the government does have the burden of establishing that the defendant's activities are forbidden by the criminal copyright statutes, this characterization of the burden does not completely address the defendant's assignment of error. Rather, the concern is how the government can go about satisfying this burden. As explained below, we conclude that the government's burden encompasses proving that the copies were unauthorized copies, but does not necessarily

extend to disproving "every conceivable scenario in which appellant would be innocent of infringement." *United States v. Whetzel*, 589 F.2d 707, 711 (D.C.Cir.1978).

There are two acceptable methods of satisfying the first sale doctrine. The first method entails tracing, step-by-step, every possible source of the particular copy of the work in question. This, in essence, requires the government to disprove the possibility that the tape came from any legitimate source. *See, e.g., Wise*, 550 F.2d at 1191.

■ The other recognized method of satisfying this doctrine is for the government to prove that the copy in question was made without authorization from another recording. *Moore*, 604 F.2d at 1228. Under this method, the government can show that the copies in question have illegitimate origins. Therefore, "[t]he government may prove the absence of a first sale by direct evidence of the source of the pirated recordings or by circumstantial evidence that the recording was never authorized." *Drum*, 733 F.2d at 1507. As a logical result, the first sale doctrine only permits the "sale of a particular lawfully made copy, not its reproduction." *Id.* If the government produces evidence from which a jury could find beyond a reasonable doubt that the defendant was in the business of making "bootleg" or "pirated" copies, there is no justification for requiring the government to trace every copy of the film ever produced. *See Powell*, 701 F.2d at 73 (the first sale doctrine is not applicable to "bootleg" copies since, by definition, a "bootleg" copy is not authorized and the copyright owner could not have parted with his title to that copy through a first sale).

■ The defendant argues that the government's evidence was insufficient to satisfy the first sale doctrine because the government's witnesses did not have personal knowledge as to the source of the specific tapes/copies in question and that the copies of the film could have been made from salvage film, contrary to contract, or at a time before the copyrights were issued. We will judge the sufficiency of the evidence under the second method discussed above since that is how the government chose to proceed with its evidence.

■ As an initial matter, the district court ruled that the government's witnesses who testified about the movie companies' records on particular copies of motion pictures were competent to testify as to those facts, noting that it would be impractical to require each individual who had conducted part of the search to testify. We believe the court was correct in observing that the witnesses' lack of personal knowledge only goes to the weight to be given their testimony, not its admissability, and the defendant's argument in this regard must fail. *See United States v. Reese*, 568 F.2d 1246, 1252 (6th Cir.1977) (noting that Fed.R.Evid. 803(6) "allows such records of regularly conducted activity to be admitted through the testimony of 'the custodian *or other qualified witness*,'" and does not require the individual to have "personal knowledge of the particular evidence contained in the record") (emphasis added by court in *Reese*).

For his remaining argument, the defendant relies principally on *United States v. Atherton*, 561 F.2d 747 (9th Cir.1977). In *Atherton*, the government attempted to meet its burden under the first sale doctrine by showing, simply, that no copies had been the subject of a first sale, and therefore *these* copies could not have been. This theory failed, however, because each film *had* been the subject of a first sale and the government had failed to consider a particular contract provision a "sale" within the definition of "first sale." As a result, the government could not have satisfied its burden because it had failed to produce any evidence relating to where the particular copies had come from. We believe the defendant's reliance on *Atherton* is misplaced because, in the instant case, the government did not fail to produce evidence; rather, its evidence was more than sufficient to meet its burden under the first sale doctrine.

The evidence established that Sachs was operating a business known as "Video Graphics, Inc.," that he had in his possession master tapes, blank tapes and electronic machinery used to duplicate videotapes, and that he told an undercover agent that he was going to "duplicate" the films which the agent eventually purchased. The custodian of the records for Columbia Pictures, Vickie Solomon, testified that she caused others to search the records regarding first sales. She stated that in the normal course of business, Columbia Pictures "keep documentary proof, memorandums, writings, and track of all its motion pictures, its television shows, and all presentations." The search conducted with regard to the movie "Shampoo" showed that at the time of the alleged infringements, "Shampoo" was not produced on ¾-inch tape or video cassettes.

Charles Marburg testified in regards to the movie "Blazing Saddles," and the relevant records at Warner Brothers. A search of the records conducted established that the movie was first released in video cassette format in January 1980, well after the alleged offenses. The search also revealed that in 1978, no one was authorized to duplicate this movie. Marburg testified that he had no personal knowledge as to whether Warner Brothers allowed taping prior to January 1980. He also stated that films were sent to a salvage company for silver reclamation, and that it was physically possible to duplicate a motion picture that had been submitted to a salvage company.

John Nuances testified for Universal Pictures in regards to "Smokey and the Bandit." He testified that a review of the records conducted at his request confirmed that defendant Sachs was not authorized to distribute this film. He testified that the quality and packaging of the film confiscated from Sachs' apartment were different from films manufactured and sold by Universal, and that there were some differ-

ences in the ending of the films.[3] All these factors indicate that the tapes may not have been legitimate copies. He also stated that if films are sent for silver reclamation, Universal Pictures receives the blank stock after reclamation and the film may or may not be sent to the reclamation company intact.

This evidence establishes that videotapes of these films either were not being sold at the time of the crimes charged in the indictment, or were sold in a different form than the copies which were sold by Sachs. Even if there had been a first sale with regards to some copies of "Shampoo" or "Blazing Saddles," there could not have been a first sale of any ¾-inch or cassette videotape of either movie. Further, even if the salvage companies received a complete copy of any of these films, there is nothing to indicate that the defendant was authorized to make videotaped copies from such a tape. Similarly, although there may have been taping permitted prior to video cassette distribution, that fact does not authorize unlimited duplication of a copyrighted movie. The evidence establishes that neither the defendant nor his company were authorized to duplicate or distribute these films. This evidence, coupled with agent Owens' testimony, the items seized, and the "total absence of evidence suggesting that the tapes were legitimate," *Moore*, 604 F.2d at 1223, is sufficient to uphold the jury verdict.

Contrary to what the defendant asserts, the government's burden under the first sale doctrine does not require it to

> disprove every conceivable scenario in which appellant would be innocent of infringement. Rather, the standard remains that an accused is entitled to a judgment of acquittal "only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

*United States v. Whetzel*, 589 F.2d 707, 711–12 (D.C.Cir.1978) (quoting *United States v. Davis*, 562 F.2d 681, 683 (D.C.Cir.

---

**3.** Nuances testified that the film seized from Sachs' apartment ended with a frame entitled "Intermission" and a black screen. The Univer-

sal version ends with the Universal logo and an advertisement relating to the Universal Studios.

1977)) (footnotes omitted).[4] We hold, therefore, that the government met its burden under the first sale doctrine and we find the evidence is sufficient to uphold the defendant's convictions under the relevant copyright infringement provisions.

## B. DISMISSAL OF CHARGES AGAINST COCONSPIRATOR

■ Irving Stollman was named as the co-defendant and coconspirator in defendant's indictment. The charges against Stollman were dismissed, however, pursuant to the government's motion in 1979. Since the crime of conspiracy requires at least two actors, *see* 18 U.S.C. § 371, the defendant argues that the dismissal of conspiracy charges against Stollman mandates the dismissal of conspiracy charges against the defendant.

■ It is clear that the crime of conspiracy cannot be committed by an individual acting alone since, by definition, conspiracy is a group offense. *United States v. Fox,* 130 F.2d 56, 57 (3d Cir.), *cert. denied,* 317 U.S. 666, 63 S.Ct. 74, 87 L.Ed. 535 (1942). Further, if coconspirators are tried together, an acquittal on conspiracy charges as to all but one coconspirator mandates acquittal on conspiracy charges as to the remaining defendant. *See United States v. Espinosa-Cerpa,* 630 F.2d 328, 331 (5th Cir. 1980). This is known as the "traditional rule," *id.,* or the "rule of consistency." *United States v. Sangmeister,* 685 F.2d 1124, 1126 (9th Cir.1982).

■ However, if coconspirators are tried separately, the acquittal of all other coconspirators does not mandate acquittal as to the remaining conspirator. *United States v. Roark,* 753 F.2d 991 (11th Cir.1985). This result is necessary because different juries may hear different evidence; "[t]hat the evidence was insufficient to support a guilty verdict in the one case does not mean that conviction on different evidence in another case was improper." *Id.* at 996.

In other words, it is not necessarily inconsistent for two juries to reach differing results.

■ Similarly, if charges are never brought against other alleged coconspirators, if charges are dismissed against all other coconspirators, or if a coconspirator has not yet been tried, dismissal of charges against the remaining conspirator is not required. *See, e.g., Sangmeister,* 685 F.2d at 1126–27 (dismissal of charges against coconspirator); *United States v. Shipp,* 359 F.2d 185 (6th Cir.) (one coconspirator had been granted a nolle prosequi and the other had not been tried), *cert. denied,* 385 U.S. 903, 87 S.Ct. 213, 17 L.Ed.2d 134 (1966); *Ng Pui Yu v. United States,* 352 F.2d 626, 633 (9th Cir.1965) (charges against 13 of the 14 coconspirators were dismissed; "[i]t is not necessary, to sustain a conviction for a conspiracy, that coconspirators be charged."). This is so because a dismissal of charges is not the equivalent of an acquittal. *United States v. Fox,* 130 F.2d at 58.

Since the charges were dismissed against Stollman, the district court did not err by denying defendant's motion to dismiss the conspiracy count against him.

## C. JURY INSTRUCTIONS

■ On September 9, 1985, the jury spokesperson made the following statement to the court:

> I think where the people are having a little difficulty in understanding [the Judge's closing instructions] is the term revolving around the conspiracy portion of it. How we should look at it. There is some question as to the other person involved in this conspiracy.

The court, in response to this concern, chose to repeat the entire conspiracy instruction. The defendant takes issue with regard to the following mistake made by the district court during the course of its

---

**4.** As enunciated by the Supreme Court, the evidence is sufficient to uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (original emphasis).

instructions, for which the defendant requests a mistrial:

> The conspiracy charges—excuse me. The Indictment charges a conspiracy among the defendants *Sachs and Laymen and others*, each of whom are named in the Indictment as coconspirators, and some who are not so named because the Indictment says that the grand jurors do not know who they are.

(Emphasis added). The defendant contends that the jury was misled by the reference to "Laymen." In continuing its instructions, however, the court stated:

> I think I said "laymen". Let me repeat that correctly. The Indictment charges a conspiracy among the Defendant Sachs and Stollman and others, some of whom are named in the Indictment as coconspirators, and some who are not so named because the indictment says that the grand jurors do not know who they are. A person cannot conspire with himself and therefore, you cannot find a defendant guilty unless you find beyond a reasonable doubt that he participated in a conspiracy as charged with at least one other person, whether a defendant or not, and whether named in the Indictment or not.
>
> You may remember that the Defendants, Lee William Sachs and Irving Stollman were accused in the Indictment of committing a—crimes of conspiracy in criminal copyright infringement. The charge against one of the defendants, Irving Stollman has been disposed of, and that person is not a defendant here. You are not to consider this fact when deciding whether the Government has proved, beyond a reasonable doubt, that the other defendant, Lee William Sachs, committed the crimes charged. However, you must consider whether Stollman was a coconspirator, since, as I told you earlier, a person cannot conspire with himself.

The function of a jury instruction is to "inform the jury of the applicable principles of law and fairly [to] present the relevant considerations." *Losey v. North American Philips Consumer Electronics Corp.*, 792 F.2d 58, 59–60 (6th Cir.1986) (citing *Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1181 (6th Cir.1983)). Jury verdicts will not be reversed on the basis of jury instructions unless the reviewing court concludes that the instructions confused, misled or prejudiced the jury. *See id.; DSG Corp. v. Anderson*, 754 F.2d 678, 679 (6th Cir.1985); *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir.1984), *cert. denied*, 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 and —— U.S. ——, 105 S.Ct. 1846, 85 L.Ed.2d 145 (1985).

In the instant case, the district court immediately recognized its inadvertent mistake and then proceeded to explain its mistake to the jury as well as to provide proper and concise instructions. The defendant moved for a mistrial, but the court denied the motion. We agree with the district court that this slight erroneous remark, by itself, should not result in reversal or mistrial, especially since a curative instruction was immediately given.

## D. INTRODUCTION OF EVIDENCE SEIZED IN 1985

After the defendant's jury trial was underway, and on the last day testimony was heard, the defendant filed a motion with the court to suppress evidence which was seized during his 1985 Florida arrest. Specifically, the defendant objected to the introduction of documents which showed that he had been using a false name. The government sought to introduce these documents as evidence of flight and concealment to establish consciousness of guilt. The defendant argued that this evidence should not have been admitted because the government had not established that the items were seized pursuant to a search warrant, a lawful arrest or the defendant's consent.[5] The court denied this motion,

---

5. The defendant previously had argued, before trial, that the evidence was irrelevant or inadmissible under Rule 403, Fed.R.Evid. The dis- trict court concluded that the "evidence of flight and concealment is admissible in order to show

reasoning that motions to suppress should be raised before trial pursuant to Fed.R. Crim.P. 12(b)(3). On appeal, the defendant argues at length that this evidence was inadmissible because the government had not established that the items were seized during the course of a lawful arrest, but does not address Rule 12(b)(3) or even the propriety of the district court's ruling on his motion.

Federal Rule of Criminal Procedure 12(b) provides in part:

(b) **Pretrial Motions.**

... The following *must* be raised prior to trial:

.    .    .    .    .

(3) Motions to suppress evidence....

(Emphasis added). The failure to timely file a motion to suppress evidence "shall constitute waiver thereof, unless the court grants relief from the waiver." *United States v. Worthington*, 698 F.2d 820, 824 (6th Cir.1983). *See also* Fed.R.Crim.P. 12(f); *United States v. Schwartz*, 535 F.2d 160, 163 (2d Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977); *United States v. Wood*, 609 F.2d 246, 248 (6th Cir.1979) (per curiam) ("We cannot properly speculate now as to what would have been developed at the suppression hearing if the motion had been made and the hearing had been held."); *United States v. Mangieri*, 694 F.2d 1270, 1282 (D.C.Cir.1982) (failure to file pretrial motion to suppress at the time designated by the trial court constituted waiver). Further, if a party fails to timely file a Rule 12(b) motion, the merits of the motion are not preserved for appeal even if the district court chose to hear the motion; the district court's review of the motion "does not alter the fact that the motion to suppress was made in violation of Fed.R.Crim.P. 12(b)(3), nor does it alter the fact that defendant waived the objection under Criminal Rule 12(f)." *United States v. Worthington*, 698 F.2d at 824.

Since the defendant failed to timely file this motion to suppress, he waived these

arguments and this court lacks jurisdiction to review their merits.

Having rejected each assignment of error, the defendant's convictions are accordingly AFFIRMED.

consciousness of guilt." The defendant does not    renew this argument on appeal.