UNITED STATES of America

v.

Raymond M. BILY.

Crim. No. 75–457.

United States District Court,
E. D. Pennsylvania.

Nov. 13, 1975.

As Amended Dec. 12, 1975.

James Manning, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Edward C. Connolly, Warminster, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

This is a criminal prosecution under the Copyright Act, 17 U.S.C. §§ 1, 101, and 104.[1] The defendant has made three pretrial motions. He moves this Court to quash the indictment, to suppress evidence, and to return seized property. Our disposition of these three motions is as follows. The motion to quash is denied.[2] The motion to suppress evidence is denied as to evidence obtained in the search of January 9, 1975, except that it is granted as to the copy of the film, "White Christmas." The motion is granted as to all evidence seized in the search of January 10, 1975. The defendant's motion under Fed.R.Crim.P. 41(e) for return of seized property is denied with prejudice as to property taken in the search of January 9, 1975, with the exception of the copy of the film, "White Christmas." As to "White Christmas," and all property seized in the search of January 10, 1975, the defendant's Rule 41(e) motion is denied, without prejudice to refiling within 60 days if at such time he is prepared to present new evidence to support his contention of ownership of the seized property.

## I

Defendant Raymond M. Bily lives in Warminster, Pennsylvania. He has maintained in his house and garage a large collection of motion picture films, and he has been listed as a collector in the 1973 International Directory of 16mm film collectors. On January 9, 1975, two special agents of the Federal Bureau of Investigation visited Mr. Bily's residence. They asked to examine his collection and to speak with him about it. Mr. Bily said that he was not surprised by the visit, since he had been told by other collectors that they had recently been called on by FBI agents.

After a brief discussion with the agents, Mr. Bily signed a waiver of rights form entitled "Interrogation; Advise of Rights." The agents talked with Mr. Bily for about two hours, and then informed him that they would like to search his house. Mr. Bily consented, executing a consent to search form which included this statement:

"These agents are authorized by me to take from my premises any letters, papers, materials or other property, which they may desire."

For approximately two more hours the agents searched Mr. Bily's house and garage, and continued to converse with him, whereupon Bily said, "That's enough. I want you to stop." The agents left the Bily residence, taking with them 16mm copies of the motion pictures, "Marooned," "White Christmas," and "Sweet Charity."

On January 10, 1975, the agents obtained a search warrant[3] and returned to Mr. Bily's home, which had been kept under FBI surveillance since the termination of the first search. Under the authority of the warrant, five agents and a technician spent approximately nine hours in the Bily residence selecting and removing 2,702 reels of film.

---

1. 17 U.S.C. § 104 provides, in pertinent part: "Any person who willfully and for profit shall infringe any copyright secured by this title, or who shall knowingly and willfully aid or abet such infringement, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by imprisonment for not exceeding one year or by a fine of not less than $100 nor more than $1,000, or both, in the discretion of the court . . . ."

2. The defendant clearly has failed to carry his burden of proving selective prosecution, which is the sole ground for his motion. *United States v. Berrigan*, 482 F.2d 171 (3d Cir. 1973). *United States v. Wilkinson*, 389 F.Supp. 465 (W.D.Pa.1975).

3. A copy of the Search Warrant and of the Affidavit for Search Warrant are appended to this Opinion.

On July 29, 1975, Mr. Bily was indicted in five counts of copyright infringement for profit. The five counts corresponded to the alleged infringement of five films; "Harlow", "Hombre", "Shenandoah", "Sweet Charity", and "White Christmas".

On September 24, 1975, this Court held a hearing on the defendant's three pre-trial motions. We heard the testimony of Mr. Bily, Mrs. Bily, Agents Creasy and Hoover, and the government's expert witness, Mr. Nolan.

■ The question of the validity of the first search presents factual questions only, and they can be dealt with briefly. The defendant alleges that his consent was not voluntarily given, both because he was under the influence of a medication at the time of his waiver of rights, and because the agents tricked him into signing the consent form by falsely stating that if he refused to waive his rights they would be back with a warrant in a half hour. We reject these contentions. Specifically, we find a) that the defendant was clear-minded and not acting under duress when he agreed to the search of his home, and b) that neither agent stated to the defendant that if he did not sign the waiver form a search warrant would be obtained immediately.

We credit in full the testimony of Agent Creasy in regard to the time the agents commenced taking possession of three films. That is, the agents had picked up "Marooned" and "Sweet Charity" before Bily demanded an end to the search, but "White Christmas" had not been taken prior to that time.

These statements were made at Creasy's cross-examination (Record, at 42):

Mr. Connolly: "In other words, if I understand what you are telling us you picked up WHITE CHRISTMAS after he told you to stop, is that true?"

Agent Creasy: "That is correct."

We find that Bily's demand was a revocation of consent that took immediate effect. The seizures of "Marooned" and "Sweet Charity" were valid, because they were commenced before the revocation. However, there was no consent to the taking of "White Christmas". Nor were there grounds for an involuntary seizure. The reasons are set forth below in our discussion of probable cause in connection with the January 10th search warrant.

II

The question of the validity of the search warrant used to gain entry for the January 10 search and seizure presents difficult legal issues. There are relatively few reported decisions in the area of civil copyright infringement, only a handful dealing with criminal infringement, and none that we could find addressing the question of probable cause in a criminal infringement case. We know only of one relevant decision in which the Copyright Act was interpreted and applied in the unique factual setting of the film distribution systems of major motion picture studios.

The basic question facing the Court is, what constitutes probable cause for belief that a person has criminally infringed film copyrights? The answer to that question sets the standard with which we are to decide whether the facts alleged in the Affidavit for Search Warrant are legally sufficient to support the Magistrate's finding. What makes the final calculation so difficult, is that one must make two kinds of estimates which push in opposite directions. On the one hand, the government points out that a probable cause showing requires far less complete proof than is ultimately needed to convict an offender. On the other hand, the defendant argues that the Copyright Act places an extremely stiff burden of proof on the government prosecutor, and this burden correspondingly increases the evidentiary showing needed to demonstrate probable cause.

Briefly, the government's position is that it need only establish the probability that a crime has occurred and evidence is being secreted, and it is not required to make a *prima facie* showing of illegal activity, much less guilt beyond

a reasonable doubt. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), *United States v. Spinelli*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Moreover, the first-hand evaluations of a prudent law enforcement officer, based on his experience with similar situations, must be given weight. *Jackson v. United States*, 112 U.S.App.D.C. 260, 302 F.2d 194 (1962). Indeed, the government's strongest argument in support of the warrant is that the inferences made by the FBI agents after viewing Bily's large film collection and after spending an afternoon with Bily should compensate for weaknesses in the government's preliminary proofs regarding the elements of infringement and profit. We have to conclude, however, that we cannot rely on these impressions as much as would be needed to uphold the warrant.

The defendant stresses the implications of the unusual character of the alleged crime, infringement for profit. Judicial interpretations of the probable cause test have mostly been made in prosecutions for undeniably antisocial acts—narcotics distribution, bookmaking, thefts, assaults, and the like. But here, the very statute which prohibits certain narrowly defined uses of creative works actually encourages people to deal in such materials outside of the prohibited area. Moreover, criminal copyright infringement incorporates as one of its elements the concept of civil copyright infringement. Civil copyright law has not entirely kept pace with the problems created by new forms of media and copying.[4] The instant case implicates an area of civil copyright law where the

rules of proof are far from settled, which necessarily raises questions about the evidentiary showing needed to establish criminal liability. We think the defendant is correct in focusing attention on the relationship between the law of civil infringement and the proof of criminal infringement. The balance of section II of this opinion contains an analysis of this relationship. In section III, we consider the sufficiency of the search warrant in light of this analysis.

 Civil copyright law is a compromise between competing social policies—one favoring the widest possible dissemination of new ideas and new forms of expression, and the other giving writers and artists enough of a monopoly over their works to ensure their receipt of fair material rewards for their efforts. The first policy predominates, which means that the system of rewards is to be no more extensive than is necessary in the long run to elicit a socially optional amount of creative activity.[5] Thus, it is in keeping with the policy of the act for courts to be careful not to chill dealing in creative works, when that conduct approaches, but does not cross, the borderline of infringement. In the civil context, this leads to the conclusion that the burden of showing the non-occurrence of a first sale (which is critical to liability for infringement) must be put on the plaintiff. It was so held in *American International Pictures, Inc., et al. v. Evan H. Foreman*, 400 F.Supp. 928 (S.D.Alabama, 1975), a case dealing with film copyrights, which may be the only decision with a holding on this precise issue. We find the reasoning of the Alabama court to be persuasive. In the in-

---

4. The National Commission on New Technological Uses of Copyrighted Works, whose members are appointed by the President, is attempting to formulate some solutions to this problem.

5. "The Copyright Act (17 U.S.C.) was passed by Congress pursuant to the authority contained in the United States Constitution, which grants to Congress the power:

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to

their respective Writings and Discoveries. (Art. I, Sec. 8, Cl. 8)

As the language of the clauses itself makes clear, the primary purpose of a copyright is 'not to reward the author, but is rather to secure the general benefits derived by the public from the labor of authors.' Nimmer on Copyright, Vol. 1, § 3.1 (1975); citing, *Fox Film Corp. v. Doyal*, 286 U.S. 123, 52 S.Ct. 546, 76 L.Ed. 1010 (1932)." *American International Pictures, Inc., et al. v. Evan Foreman*, 400 F.Supp. 928, at 933 (S.D.Ala.1975).

stant case, a criminal prosecution, the principles of the Copyright Act impel us to apply a test for probable cause which will not result in the chilling of conduct near the borderline of infringement, conduct which is considered to be of public benefit.

## FIRST SALE DOCTRINE

 Through the Copyright Act, (17 U.S.C. § 1 et seq.) Congress has given copyright proprietors the right "to print, reprint, publish, copy and vend the copyrighted work." 17 U.S.C. § 1(a). The right to vend is not exclusive. Section 27 of the Act, the source of the first sale doctrine, provides in pertinent part:

". . . nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

Once the copyright proprietor transfers a particular copy of his work to another person under conditions which satisfy the first sale doctrine, the statute does not restrict further transfers of that copy.[6] (The transferee still may not make copies of his copy without authorization. This is not pertinent to out decision because in the affidavit for search warrant it is not alleged that Bily manufactured films.[7])

Copyright proprietors frequently transfer rights in their works by complicated agreements which cannot simply

be called "sales". In each case, the court must analyze the arrangement at issue and decide whether it should be considered a first sale. In one such case, which, like the present one, was a prosecution under 17 U.S.C. § 104, it was said that the question was whether the copyright owner had

"had the opportunity to exercise one time his exclusive right to vend over such copies by the act of granting the license and receiving a consideration therefor." *United States v. Wells,* 176 F.Supp. 630, 635 (S.D.Texas 1959).[8]

In *Wells,* the copyright owner, Tobin, had licensed 107 customers to make copies of aerial maps. It was established at trial that the defendant sold copies of aerial maps bearing Tobin's copyright notices on their faces, that those copies had not been manufactured in the Tobin plant, and that the defendant was not one of the 107 customers licensed to make copies. After examining the contracts between Tobin and his customers, the court found that these contracts were first sales in the sense that the customers acquired title to all the copies they made under the license. It was noted that the contract had not expressly reserved title to the copies in Tobin, and the transactions had been supported by consideration.

The court next addressed itself to the possible criminal liability of the defendant, who was not a licensee. The

---

**6.** For example, after one buys a new book from the publisher, one can resell the book without violating the Copyright Act.

**7.** One interpretation of the Act is that unauthorized copying

"is a fundamental and continuing infringement . . . to which the buyer of such a copy makes himself a party by selling it or performing the work for profit." *United States v. Wells,* 176 F.Supp. 630, 635 (S.D. Texas 1959)

The quotation is part of a discussion of Judge Learned Hand's opinion in *Foreign & Domestic Music Corp. v. Licht,* 196 F.2d 627 (2d Cir. 1952).

**8.** The fair value factor was emphasized in a Supreme Court opinion which posed the test,

"whether or not there has been such a disposition of the article that it may fairly be

said that the patentee [or copyright proprietor] has received his reward for the use of the article." *United States v. Masonite Corporation,* 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), quoted in *Platt & Munk Co. v. Republic Graphics, Inc.,* 315 F.2d 847, 854 (2nd Cir. 1963).

The Court duly noted, however, that the fair value question was subsidiary to the societal interests which the patent monopoly was designed to serve.

"[T]he promotion of the progress of science and the useful arts is the 'main object'; reward of inventors is secondary and merely a means to that end." 316 U.S. at 278, 62 S.Ct. at 1077.

See also, *Burke & Van Heusen, Inc. v. Arrow Drug, Inc.,* 233 F.Supp. 881, 884 (E.D.Pa.1964).

government's burden of proof was said to be the following:

"[T]here must be a showing on the record that the copies of these aerial survey maps were not published by a lawful licensee of the copyright proprietor, or that title to these copies was retained at all times by the copyright proprietor. In the absence of such a showing complete proof of infringement has not been offered, and defendant should be acquitted. *Though it may seem burdensome for the Government to be required to produce the testimony of Tobin's 107 contract customers that the copies were not published under their licenses, this burden is not caused by the requirements of the law but by Tobin's distribution system.*"[9] 176 F.Supp. at 635–636. (Emphasis added)

It has been held that a copyright proprietor exhausted his one-time exclusive right to vend, when he sold materials subject to the condition that they be put only to a specified use (waste paper), and the purchaser materially breached that condition. *Independent News Co. v. Williams,* 293 F.2d 510 (3d Cir. 1961). The need for a careful analysis of the actual relationship between the parties is pointed out by Judge Friendly, in his opinion in *Platt & Munk Co. v. Republic Graphics, Inc.,* 315 F.2d 847, 854 (2d Cir. 1963):

"[J]ust as we have rejected defendants' absolute contention that anyone in lawful possession of copyrighted goods may sell them without infringement, we likewise reject plaintiff's extreme position that copyrighted goods

are immune from the normal remedies of unpaid creditors until the proprietor has had one truly voluntary 'sale'."

These cases show the importance of distinguishing between contractual and statutory restrictions on what a person who holds a copyright work—but not the copyright—can do with the work. A pirated copy is one which has been obtained or made in violation of the statute. In most circumstances, a person who has purchased a work which he knew was pirated has not "lawfully obtained" it. His resale of the copy will be an infringement, Section 27 notwithstanding.[10]

On the other hand, if the chain of transactions leading to a person acquiring possession of a copyrighted work contained breaches of contract, but no pirating, he has not infringed the copyright, and unless the non-occurrence of a first sale is affirmatively shown, he is not restricted in his further transfer of the copy. In the instant case, the affidavit contains no direct evidence, or substantial circumstantial evidence, that Bily manufactured films. Therefore, the government's theory of infringement at the time it sought the warrant had to be based on unauthorized sale or renting of films. On this theory, the government would ultimately have to prove the non-occurrence of first sales of the films in question. The statements in the affidavit may show a probability that there occurred some breaches of contract by persons in the chain of transfers culminating in Bily's possession of the films identified by the agents. However, it is questionable that there was a showing of a probability even that he was a civil infringer.

9. The instant case involves even more complex distribution systems. The practices of seven major film producers were examined in *American International Pictures, Inc. v. Foreman,* 400 F.Supp. 928 (S.D.Ala.1975). It was found that the plaintiff film producers did not carry their burden of proving that the films sold by the defendant, allegedly in violation of the Copyright Act, had not been the subject of first sales. In the case before us, we heard the testimony of the government's expert that the copyright owners of some of the copies found in Bily's possession had not sold any copies of those films. This statement did not appear in the affidavit for search warrant. If this conclusory statement had so appeared, it would have needed further factual support at the hearing to be given full weight, considering that in *American International Pictures, supra,* each of the plaintiffs claimed "that it [had] never sold or given away any print of any of the motion pictures on which infringement is alleged", yet the court found that none of them proved that claim. 440 F.Supp. at 929.

10. See footnote 7, *supra.*

### III

The problems of proof for a civil plaintiff under the copyright laws, as difficult as they may be, are much less than those of the government in a criminal prosecution. Under the civil law, there is strict liability for infringement. *Buck v. Jewell-LaSalle Realty Co.,* 283 U.S. 191, 198, 51 S.Ct. 410, 411, 75 L.Ed. 971, 976 (1931). *Shapiro, Bernstein and Co. v. H. L. Green Co.,* 316 F.2d 304, 308 (2d Cir. 1963). Even if the infringer had no economic motive and in fact netted no material gain from his conduct, he would still be liable for any damages caused to the copyright holder. The criminal law casts a smaller net. One cannot be convicted unless he has *willfully* infringed. Second, the infringing activities must have been engaged in *for profit.* Congress did not intend to make the bona fide film hobbiest a criminal. If a hobbiest willfully infringes a copyright, say by copying a copyrighted film without authorization, he is civilly liable to the copyright holder for the damages caused by· the infringement, but for that act alone he cannot be convicted under 17 U.S.C. § 104.

The government has to carry several burdens to convict this defendant under 17 U.S.C. § 102—it must show infringement, that the infringement was willful, and that it was engaged in for profit. Moreover, each element of the crime must be proven beyond a reasonable doubt. It is the combined effect of the policies behind the Copyright Act; the definition of the crime; and the principles of our criminal justice system which puts the government to this test. It would be both anomalous and unjust if this statute were interpreted to allow the government to forcibly search a person's home and carry away property on the basis of facts that would not even make out a strong claim for civil copyright infringement.

Did the allegations in the search warrant establish probable cause for belief that Bily had committed willful infringement for profit? The threshold question is whether any of those allegations were untrue. We find that there are neither any intentional or unintentional misrepresentations, *United States v. Armocida,* 515 F.2d 29, 41 (3d Cir. 1975), but that there are two ambiguities.

The first ambiguity is the following statement (the language of the printed form is emphasized):

"[The affiant has reason to believe that] *there is now being concealed certain property, namely* unauthorized copies of duly copyrighted motion pictures, including . . .."

It is clear from the testimony of the agents at the hearing, and it is consistent with the other statements in the affidavit, that the term "unauthorized copies" was not intended as an allegation that the agents had reason to believe at that time that Bily was manufacturing copies of copyrighted films. Rather, "unauthorized" refers to the allegations in paragraphs six and seven that Bily had no contractual right from the copyright owners to possess the films.

A more important ambiguity is in paragraph two of "Attachment 'A'" to the affidavit which states, in pertinent part:

"Mr. Bily freely admitted that he had in his possession at that moment (January 9, 1975) many 16mm copyrighted motion pictures and that he had been engaged in the buying, selling, and trading of motion pictures *for profit* for 23 years." (Emphasis added).

There was no testimony at the hearing that Mr. Bily actually used the phrase, "for profit". The FBI agents did testify that when they indicated to Mr. Bily near the end of the January 9th search that they intended to retain possession of some of his films, Mr. Bily became very excited and exclaimed, "If you take my films you take my livelihood." Mr. and Mrs. Bily each testified at the hearing that this statement was never made. The alleged statement came at a tense moment, and it is possible that some or

all of the witnesses did not hear it precisely or had an imperfect recollection of it. Even if those exact words were uttered, they are ambiguous, and cannot automatically be translated into the conclusory statutory term, "for profit". For example, Mr. Bily would be perfectly within his rights to sell for profit any copyrighted films in his possession that had already been subject to a first sale, just as a person could sell copyrighted books in his library provided they were not pirated volumes.

Except for our qualifications about these two ambiguous phrases, we have taken the allegations in the affidavit to be true. We will now assess the probative value of the statements in each paragraph of the affidavit. The purpose of this is to lay bare the relevant factors in our decision; our final conclusion is based on a common sense reading of the whole affidavit, *United States v. Bamberger*, 482 F.2d 166 (9th Cir. 1973), cert. den. 414 U.S. 1041, 94 S.Ct. 543, 38 L.Ed.2d 332 (1973).

Paragraph one states that Mr. Bily's name was obtained from a directory of film collectors. There is no explanation why Bily was chosen out of the many names in the Directory. The government's expert witness admitted at the hearing that there are many thousand film hobbiests whose pursuit of their hobbies is entirely lawful.

Paragraph two summarizes statements made by Bily during the January 9 search. They are probative of the fact that Bily dealt in copyrighted films for profit. We have already pointed out, however, the ambiguity of the term "for profit" in this paragraph. Also, there is no admission that any dealings made "for profit" were transfers that infringed copyrights.

Paragraph three describes a particular transfer of a particular film. The details of the transaction connote a commercial relationship, but are also consistent with hobby activities. Both the defendant and the government's expert testified that film collectors frequently trade films for money in lieu of other films.

Paragraph four identifies three films taken from Bily on January 9, and gives the copyright status of those three, and of other films seen in Bily's home. Specifically, it is stated that Bily "has no right *from [the copyright owners]* to duplicate, sell, or otherwise possess these films." (emphasis added) This quotation fell far short of stating the elements of an infringement. Duplication was not at issue. And Bily could have had the right to sell or to otherwise possess those films, even if the copyright owners had never given him such a right. The copies in question could have been transferred by the copyright owners to other parties, in transactions that satisfied the first sale criteria. Even if sales contracts or licenses prohibited further transfer, and the party transferred the film to Bily in breach of the agreement, Bily could then be the lawful possessor, with no contractual obligations to the copyright owners, and he would not be liable under the Copyright Act for his subsequent transfer of the copy. The copyright owner would have a cause of action in contract against its buyer. While the statements in paragraphs four to eight are probative of infringement, they fall short of establishing a probability of it. All they do is negate the possibility of a first sale directly to Bily; they are perfectly consistent with first sales to persons who could have subsequently transferred copies to Bily.[11]

---

11. At the hearing, the defendant's expert testified that the copyright proprietors of some of the feature films in the defendant's possession had not sold any copies of those films. (See footnote 9) Assuming for the moment that they neither sold outright, nor entered leases or other agreements which might be construed to be a first sale, that statement increases the likelihood that the defendant "unlawfully obtained" some of his films. If his possession was unlawful, his vending of said films would be an infringement. However, this statement was not contained in the affidavit for search warrant. Therefore we do not reach the question whether the showing on the issue of unlawful possession, together with the allegations about vending and profit-making, would have constituted probable cause.

## CONCLUSION

We conclude that the search warrant was not issued on probable cause. The government's January 10, 1975 search of defendant's home, and the seizure of many of his films on that date violated his rights under the Fourth Amendment of the Constitution. In reaching this decision we have taken into account:

1) the standards of proof for the crime charged, willful infringement 'for profit, 17 U.S.C. § 104.

2) the policies of the Copyright Act. The non-infringing use and dissemination of creative material is considered not merely innocent activity but a public benefit. Any attempts at enforcing the Act which chill or unduly burden non-infringing use of copyright works, contradict the policy of the Act.

3) the failure to show on the affidavit, that the law enforcement officers attempted to obtain, or did obtain, other than by the January 9 search, corroborating evidence that the defendant was carrying on a film distribution business and engaging in copyright infringement. It appears that the defendant's name was picked more or less at random from a published directory of collectors.[12]

4) the absence of exigent circumstances. There was no present danger that the defendant would become a fugitive, or would destroy evidence, if a warrant was not promptly issued.[13] This would be a harder case if, while the agents were developing their evidence, the defendant was observed in apparent efforts to destroy or remove his films, and at that point a search warrant was requested, with these suspicious actions described in the affidavit for search warrant.

5) the presence of an obvious and non-criminal explanation for the facts described in the search warrant. This is not a situation where a suspicion of criminal activities is strengthened by the absence of any reasonably apparent explanation for known facts other than criminal motivation and conduct. The facts alleged in the affidavit are fairly explained by the defendant's announced and publicized [14] hobby of film collecting.

In *United States ex rel. Kislin v. State of New Jersey*, 429 F.2d 950 (3d Cir. 1970), the Court of Appeals for the Third Circuit was presented with what it called a "borderline case" on the question of the sufficiency of an affidavit for search warrant. In deciding that the warrant had been properly issued, the Court relied on the Supreme Court's statement in *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), that

> " 'Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of *doubtful or marginal cases* in this area should be largely determined by the preference to be accorded to warrants.' " 429 F.2d at 955. (emphasis added)

For the several reasons we have just given, we do not believe that the instant case is "doubtful" or "marginal". Moreover, even if the question of the probability of the commission of a crime was more evenly balanced, it would have to be noted that a prosecution under the Copyright Act is not a case "in [the] area" of the prosecutions in *Ventresca, supra*, (illegal distillery), or in *Kislin, supra*, (gambling). We doubt that the weak presumption stated in *Kislin* exists in a Copyright Act prosecution given the policy of the Act to encourage the dissemination of copyrighted materials, up to the borderline of unlawful conduct.[15]

---

12. *Cf. United States v. Armocida*, 515 F.2d 29 (3d Cir. 1975). In *Armocida*, the Court of Appeals interpreted a provision in the wiretapping statute which requires some showing in the affidavit for a wiretap that normal investigative techniques "reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(3)(c).

13. It took five agents and a technician approximately nine hours to select and remove the 2,702 reels of film that were seized.

14. By listing his name in at least one directory.

15. First Amendment values also are implicated in the instant case.

Finally, we do not believe that the standard of probable cause we have applied in this case will prove so onerous to the government as to unduly interfere with enforcement of 17 U.S.C. § 104. For example, the government could have sought further evidence of profit-making activities, or of infringement. Since the affidavit for search warrant must be read as a whole, by firming up its proof of either of these elements of the crime, the government could have brought its showing up to the threshold of probable cause. We must conclude, after applying the appropriate tests of probable cause to the instant search that the warrant of January 10, 1975, was invalid.

APPENDIX

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

Magistrate's Docket No. _____

| UNITED STATES OF AMERICA | Case No. _____ |
|---|---|
| vs. | |
| RAYMOND M. BILY<br>836 Bristol Road<br>Warminster, Pa. | AFFIDAVIT FOR<br>SEARCH WARRANT |

BEFORE PETER B. SCUDERI
Name of Magistrate

Philadelphia, Pennsylvania
Address of Magistrate

The undersigned being duly sworn deposes and says:

That he (has reason to believe) that (on the premises known as) 836 Bristol Road, Warminster, Pa., situated on the S.E. corner of the intersection of Bristol and Brookdale Roads, being a two-story, white-frame, split-level residence.

in the Eastern District of Pennsylvania

there is now being concealed certain property, namely unauthorized copies of duly copyrighted motion pictures, including "Cactus Flower", "Anatomy of a Murder", "Anastasia", "The Bedford Incident", "Hurry Sundown", "Odd Couple", "Father Goose", and "Khartoum", and other evidence and business records which is evidence of the crime, fruits of the crime or things designed or used or intended to be used to commit a crime, i.e., the sale for profit of copyrighted motion pictures in violation of Title 17, USC, Sections 1 and 104,

here give alleged grounds for search and seizure

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

"SEE ATTACHMENT 'A'"

EXHIBIT "C"

<u>EDDIE O. CREASY (s) Eddie O. Creasy</u>
*Signature of Agent*

<u>S/A, FBI</u>
*Official Title of Agent*

Sworn to before me, and subscribed in my presence. 19

<u>Probable Cause</u>

(1) On January 9, 1975, the name RON BILY, 836 Bristol Road, Warminster, Pennsylvania, was obtained from a copy of a 1973 International Directory of 16 mm film collectors as a film collector by Special Agent EDDIE O. CREASY, Federal Bureau of Investigation.

(2) On January 9, 1975, Special Agent EDDIE O. CREASY and Special Agent HERBERT C. HOOVER, JR., Federal Bureau of Investigation, interviewed Mr. RAYMOND M. BILY, 836 Bristol Road, Warminster, Pennsylvania, concerning his possible possession of copyrighted 16 mm films during this interview, Mr. BILY freely admitted that he had in his possession at that moment many 16 mm copyrighted motion pictures and that he had been engaged in the buying, selling, and trading of motion pictures for profit for 23 years.

(3) On January 9, 1975, Mr. RAYMOND M. BILY, specifically stated to Special Agent CREASY and Special Agent HOOVER that he sold during the month of December 1974 the motion picture "White Christmas" to LEONARD MALIK, Post Office Box 15073, Sacramento, California. Mr. BILY advised that later Mr. MALIK returned the film to BILY, stating that the film was poor quality and demanding a credit for the purchase of other motion pictures.

(4) On January 9, 1975, Special Agent CREASY and Special Agent HOOVER obtained from Mr. BILY the 16 mm copies of the motion pictures "Marooned", "White Christmas", and "Sweet Charity".

(5) On January 10, 1975, Special Agent JOHN ROBERT KUTZ, Federal Bureau of Investigation, reviewed the first portion of the first reel of each of the above motion pictures and determined that they were in fact color prints of "Marooned", "White Christmas", and "Sweet Charity".

(6) On January 10, 1975, Mr. MIKE MANGAN, General Attorney, Schnader, Harrison, Segal, Lewis, 719 Packard Building, Philadelphia, Pennsylvania, stated that the motion picture "White Christmas" was a

copyrighted motion picture under certificate #Lp4113, owned by Paramount Pictures Corporation. Mr. MANGAN also stated that the motion picture "Marooned" is a copyrighted motion picture under certificate #Lp37888, owned by Frankovitch Productions, Incorporated. Mr. MANGAN also stated that the motion picture "Sweet Charity" is a copyrighted motion picture under certificate #Lp38879, owned by Universal Pictures. Mr. MANGAN stated that the above stated companies still maintain copyrights on these motion pictures and that he could state that Mr. RAYMOND M. BILY of 836 Bristol Road, Warminster, Pennsylvania, has no right from them to duplicate, sell, or otherwise possess these films.

(7) On January 9, 1975, Special Agent EDDIE O. CREASY and Special Agent HERBERT C. HOOVER, JR., observed throughout the residence located at 836 Bristol Road, Warminster, Pennsylvania, the following motion pictures and others not yet identified:

| | |
|---|---|
| "Cactus Flower" | "Father Goose" |
| "Anatomy of a Murder" | "Khartoum" |
| "Anastasia" | |
| "The Bedford Incident" | |
| "Hurry Sundown" | |
| "Odd Couple" | |