Kevin F. LAVIN, Plaintiff,

v.

Claudia B. THORNTON, and David L. Wales, in their individual capacities, Defendants.

No. 95 Civ. 3640 (CSH).

United States District Court, S.D. New York.

March 24, 1997.

Kevin Lavin, Hillsdale, NJ, Pro Se.

Mary Jo White, U.S. Attorney for Southern District of New York, Office of U.S. Attorney, Heidi A. Wendel, Asst. U.S. Attorney, New York City.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

This is a *Bivens*[1] civil rights action alleging violations of plaintiff's Second, Fourth and Fifth Amendment rights by a supervising agent of the Federal Bureau of Investigation ("FBI") and an Assistant United States Attorney ("AUSA") of this district. Defendants moved to dismiss the plaintiff's complaint under Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief could be granted. Plaintiff, appearing *pro se*, responded to that motion by amending his

---

1. *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

complaint[2] to delete certain claims, while continuing to assert others. Both sides have submitted affidavits and other matters outside the pleadings. The case is now before the Court on cross-motions for summary judgment under Rule 56.

### Procedural Background

In 1992 and early 1993, plaintiff Kevin Lavin "engaged in a sophisticated scheme to steal cash from hundreds of Citibank accounts." *United States v. Lavin,* 27 F.3d 40, 41 (2d Cir.1994) (affirming Lavin's sentence following his conviction on a guilty plea to a charge of bank fraud). Lavin illicitly obtained the account numbers and personal identification numbers of Citibank customers, which he then programmed into credit cards, and used the credit cards to withdraw funds from automatic teller machines.

The FBI undertook an investigation, assisted by Nassau County police. Defendant Claudia Thornton, a supervising FBI agent of nearly 14 years' service, headed the investigation. As the result of effective surveillance techniques, on March 12, 1993 the FBI arrested Lavin at a shopping center in Baldwin, New York. On March 25 a grand jury in this district indicted Lavin for bank fraud, the use of unauthorized access devices, and conspiracy to commit those offenses. AUSA David L. Wales, the other defendant in the instant case, presented the case to the grand jury.

Documents in Lavin's possession at the time of his arrest led a team of three FBI agents headed by Thornton to a residence at 317 Park Avenue, Park Ridge, New Jersey, where the agents arrived in the early evening of March 12. That residence proved to be the home of Louis and Mary Lavin, the parents of Kevin Lavin. Kevin Lavin stayed at his parents' home on an intermittent basis, and kept some possessions there. Thornton and other agents conducted searches of the residence on March 12, March 13, and March 16, under circumstances more fully discussed *infra.* On each of these occasions, Louis Lavin executed a form consenting to the search. The agents seized a number of objects belonging to Kevin Lavin. Those ob-

jects included firearms, ammunition, and certificates of title to automobiles and other property.

Following his indictment, Lavin moved before this Court (Keenan, *J.*) to suppress the evidence seized at his parents' home. AUSA Wales represented the government. Edward P. Jenks, Esq., a Criminal Justice Act panel attorney, represented Lavin. The government called Thornton as its only witness. The defense called Louis and Mary Lavin. The hearing focused upon the validity of the searches. The testimony paid particular attention to the nature and effect of the consents to search executed by Louis Lavin.

Judge Keenan denied Lavin's motion to suppress. He found that "[u]nder the facts of this case, the FBI Agents received Mr. Lavin's consent to search on each of their three visits to the Lavin home." Opinion and Order dated November 27, 1992 at slip op. 13, 1992 WL 373486. Judge Keenan further concluded that the senior Lavins had authority, actual or apparent, to consent to a search of the areas occupied or used by Kevin Lavin. *Id.* at 13–14.

As to plaintiff's firearms that the agents seized, Judge Keenan noted a discrepancy in the testimony as to whether the first two firearms were taken on March 12, as the Lavins said, or on March 13, as Thornton said. But Judge Keenan did not think it necessary to pursue that question, since "[i]n any event, the firearms are not admissible on the Government's case against Kevin Lavin, as he has not been indicted for any weapons violations." *Id.* at slip op. 9–10.

Following the denial of his motion to suppress, Lavin pleaded guilty to one count of bank fraud. He received a custodial sentence which the Court of Appeals affirmed and which he has now served, although he remains on supervised release.

Lavin filed two motions under Rule 41(e), Fed.R.Crim.P., to recover the seized firearms and accessories, as well as other personal documents and property. Judge Keenan dealt with those motions in an opinion dated September 22, 1994, which reflects the

---

**2.** The Court granted plaintiff leave to serve and    file an amended complaint.

government's consent to the motions, with the exception of the firearms, which the government said could not be returned to Lavin as a convicted felon. Judge Keenan held that the firearms could be returned to a third party designated by Lavin, a direction that Lavin appealed and the Court of Appeals affirmed by summary order.

This action followed. I need not consider plaintiff's original complaint, which asserted a number of claims, because he has amended it. The amended complaint is limited to plaintiff's claims that the FBI's seizure of plaintiff's firearms and other personal property was unreasonable, in violation of the Fourth Amendment, and that seizure of the firearms also implicates the Second and Fifth Amendments.

Defendants, seeking summary judgment dismissing the amended complaint, rely upon the rule of *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), collateral estoppel, and principles of immunity from suit: qualified immunity in the case of Thornton, and absolute in the case of Wales.

### Factual Background

While plaintiff's voluminous pleading and brief echo some of the arguments he made during the suppression hearing, plaintiff is bound by Judge Keenan's findings in that proceeding that the senior Lavins gave three separate, voluntary and valid consents to searches of their homes on March 12, 13 and 16, 1993, and that those consents extended to areas occupied or used by plaintiff. Therefore this discussion will not revisit certain factual aspects of the case.

It is necessary, however, to consider the wording of the written consents signed by Louis Lavin. They were all on the same printed form, which FBI agents apparently carry around with them. Each of the three forms executed by Louis Lavin contained handwritten inserts specifying particular areas of the house where the agents could search. However, no alteration was made to a printed sentence in the form which reads: "These agents are authorized by me to take from my premises any letters, papers, materials or other property which they may desire." Thus, while the forms signed by Louis

Lavin imposed limitations on the areas in the house where the agents could search, there was no limitation on the nature of the items they could seize in those areas.

As noted by Judge Keenan in his suppression motion decision, there is a dispute about when Thornton and the other agents first removed firearms from the senior Lavins' home. It is common ground that the agents seized firearms on March 13 and 16. As to March 12, Thornton testified that they found firearms on that occasion, and Mr. Lavin asked Thornton to take them because "he didn't want them in his house," but Thornton declined, Tr. 276, because "they were not used in the commission of the crime, and from the rap sheets that we had, it indicated that he [Kevin Lavin] had no prior felony arrests." Tr. 286. This may be contrasted with the testimony of Louis Lavin, who said that on the evening of March 12 Thornton left with two firearms, stating that "she was taking them with her because Kevin was a convicted felon and he had no right to own weapons or rifles, something like that." Tr. 500.

Clearly this testimony cannot be reconciled. The Lavins' version is supported by an affidavit dated March 16, 1992 by James Glynn, the FBI case agent, to a District of New Jersey Magistrate Judge in support of an application for a warrant to search Kevin Lavin's automobile, kept at his parents' residence. Agent Glynn stated at ¶ 6 that "[o]n March 12, 1992," the FBI recovered *inter alia* "one rifle, one shot gun" from the home. In a letter dated April 10, 1992 that AUSA Wales sent to defense counsel Jenks on the question of plaintiff's bail, Wales also said that on "March 12, 1992," the items the FBI recovered from the Lavins' home included "two firearms."

Thornton and other agents returned to the Lavin residence during the late afternoon of March 13. It is common ground that on that occasion the agents seized firearms belonging to plaintiff. Thornton testified before Judge Keenan that before doing so, she received authorization from AUSA Wales. Thus Thornton testified on direct examination by that upon her return to the Lavins' home on

March 13, the senior Lavins again asked her to remove plaintiff's rifle and shotgun. Tr. 286. Thornton went on to say that "[w]e took them after we had talked to—discussed it with you earlier in the day." Tr. 287. In context, the "you" must be a reference to Wales, who was conducting the examination.

On cross-examination of Thornton by plaintiff's counsel, this transpired:

Q. You at one point saw a rifle and a shotgun, correct?

A. Yes.

Q. Now, that rifle and that shotgun were inside closed cases, is that right, in the foyer area?

A. No; that's not correct.

Q. They were not in boxes or not in cases?

A. The rifle was in a cardboard—like the box that it is shipped in or is—comes in from the store. The shotgun was under the blanket on the bed.

Q. Under the blanket on the bed in the room?

A. Yes.

Q. Now, you had not believed that either that rifle or shotgun or any firearms were used in this crime, correct?

A. Correct.

Q. In fact, there is no allegation of any type of violence that occurred during the unauthorized withdrawals in this case, right?

A. That's correct.

Q. So essentially thee came a time that you seized that rifle and shotgun, right?

A. Yes.

Q. Was that that night or the following night?

A. That was the following night.

Q. Now, you had no probable cause to believe that those two items that were there were instrumentalities of this crime or contraband that were used in this crime; is that correct?

A. We had no reason to—we knew that—we had no reason to believe that they were used in the crime. Whether or not they were contraband—I mean, that they were not—they did not appear to be illegal in and of themselves, but as far as his own or possession of them, we had no information regarding whether they were his or somebody else's.

Q. But you made a decision at some point to seize those two items as well, right?

A. On recommendation from the U.S. Attorney's Office.

Although it is common ground that the agents seized additional firearms belonging to plaintiff on March 16, there was no comparable inquiry into the circumstances.

Nor was there comparable evidence elicited with respect to the agents' seizure of car titles and a property deed belonging to plaintiff, which were apparently scooped up together with cash, computer disks, credit cards, and other objects clearly pertinent to the FBI's investigation into suspected bank fraud and use of unauthorized access devices.

*Discussion*

Both sides move for summary judgment. Each must therefore satisfy the summary judgment criteria: after construing the evidence in the light most favorable to the nonmoving party, demonstrating entitlement to judgment, because of the absence of any genuine issue as to any fact material under the governing law.

One may usefully begin the analysis with a consideration of the nature of plaintiff's claims, as asserted in his amended complaint. At page 24 of his brief, plaintiff aptly summarizes the more prolix allegations of the pleading:

In this action, plaintiff Lavin is not complaining of the reasonableness of the searches and seizures for evidence of a bank fraud, which was the center focus of the suppression hearing held in the criminal case (92 cr. 236), but rather, Lavin is complaining of the unreasonable seizure of his firearms, firearm accessories, car titles, and property deed, which were seized without probable cause. These property items were clearly outside the scope of what initiated the searches in the first place. And those property items were not contraband, and there existed no nexus

between the bank fraud offense and the seized firearms, firearm accessories, car titles, and property deed.

■ I do not think that claim is subject to summary dismissal on the authority of *Heck v. Humphrey, supra,* or on the basis of collateral estoppel, alternative bases urged by the defendants. *The Rule of Heck v. Humphrey*

In *Heck,* a convicted and confined state prisoner commenced a civil rights action under state law enforcement officers under 42 U.S.C. § 1983. He alleged that the officers engaged in an improper investigation, destroyed exculpatory evidence, and caused an illegal voice identification to be used at plaintiff's trial. The plaintiff did not seek release from custody or other injunctive relief; he sought only punitive and compensatory damages.

The Court dismissed the action. It held that to recover damages for conduct "whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." (footnote omitted). 512 U.S. at 486–87, 114 S.Ct. at 2372. The Court continued:

> Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.
>
> (emphasis in original; footnotes omitted)

In the case at bar, a determination that the agents' seizure of plaintiff's firearms and title

documents was unlawful would have no discernible effect upon the validity of his conviction or sentence for bank fraud. In contrast to the fruits of the officers' unlawful conduct in *Heck,* the government had no intention of offering those particular objects into evidence at Lavin's trial for bank fraud, as everyone recognized at the suppression hearing before Judge Keenan.

Defendants argue in their reply brief at 7–8 that a finding in the case at bar "that the searches were defective as to the firearms would require the conclusion that the written consents were invalid and that Agent Thornton testified falsely about the firearms issue," findings that "would invalidate the consent searches as a whole and 'imply that the plaintiff's conviction was unlawful' " (quoting *Heck* at 512 U.S. 487 n. 7, 114 S.Ct. 2372 n. 7). This argument is a *non-sequitur* and takes the quotation from *Heck* out of context. What the Court actually said in footnote 7 is that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction," since because of doctrines available to the prosecution like independent source, inevitable discovery, and harmless error, "such a § 1983 action, even if successful, would not *necessarily* imply that the plaintiff's conviction was unlawful" (emphasis in original). The skewed quotation from *Heck* in defendants' brief does not bring within that case's holding or rationale a case like the one at bar, where the government made no use at trial of the property plaintiff contends was unreasonably seized. If anything, footnote 7 in *Heck* supports plaintiff *a fortiori. Collateral Estoppel*

■ For comparable reasons, the defendants are not in a position to rely on the doctrine of collateral estoppel. Issue preclusion on the basis of collateral estoppel requires showings that (1) the issues in both proceedings were identical, (2) the issue in the prior proceeding as to which estoppel is sought was actually litigated and decided, (3) there was a full and fair opportunity for litigation of that issue in the prior proceeding, and (4) the issue previously litigated

was necessary to support a valid and final judgment on the merits. *Gelb v. Royal Globe Insurance Co.*, 798 F.2d 38, 44 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987) (cited by defendants in their main brief at 9). While Lavin cannot relitigate in this action Judge Keenan's conclusion that the senior Lavins voluntarily executed the consent to search forms, the conditions for collateral estoppel as to the present issues cannot be fully satisfied. That is because at the suppression hearing the parties did not fully litigate, and Judge Keenan did not undertake to decide, plaintiff's present claim, namely, whether during the course of a consensual search the agents' seizure of plaintiff's firearms was lawful. It was not necessary for Judge Keenan to decide that issue, because the government did not intend to offer the firearms as evidence at a bank fraud trial.

*Immunity*

So the case turns upon whether these defendants are immune from suit in this action. Wales, a prosecutor, argues for absolute immunity, with a fall-back position of qualified immunity. Thornton, a law enforcement officer, is limited to a claim of qualified immunity.

### (a) *Absolute Immunity*

█ Analysis of a prosecutor's immunity from suit must begin with *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). The Court there held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 431, 96 S.Ct. at 995 (footnote omitted). The Court left for another day consideration of "whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Id.* at 430–31, 96 S.Ct. at 995 (footnote omitted).

That later day dawned when the Court decided *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Police officers investigating a domestic shooting speculated that Burns, the homeowner, "had multiple personalities, one of which was re-

sponsible for the shootings," 500 U.S. at 482, 111 S.Ct. at 1937. The officers thought that interviewing the suspect under hypnosis might prove fruitful, but were concerned that hypnosis might be an unacceptable investigative technique. So they consulted Reed, a prosecutor, who advised the officers to proceed with the hypnosis. Under hypnosis Burns made statements that the police interpreted as supporting their multiple-personality theory. The officers again consulted Reed, who advised that on the basis of Burns' statements while under hypnosis, the officers "probably had probable cause" to arrest Burns. *Id.* Based on the prosecutor's assurance, the police arrested Burns. The next day, Reed appeared with a police officer before a judge and obtained a search warrant on the basis of a "misleading presentation" as to the prior events. *Id.* at 483, 111 S.Ct. at 1937. Burns was indicted, but the trial judge suppressed the statements given under hypnosis, the charges were dropped, and Burns filed a § 1983 action against Reed. Reed asserted a defense based upon absolute immunity.

The Court held that the absolute prosecutorial immunity recognized in *Imbler* was applicable to Reed's participation in the probable cause hearing leading to issuance of a search warrant, notwithstanding the misleading nature of his presentation. But the second question posed was whether absolute immunity extended to Reed's "legal advice to the police regarding the use of hypnosis and the existence of probable cause to arrest [Burns]," 500 U.S. at 487, 111 S.Ct. at 1939; and that conduct, the Court concluded, was covered only by a qualified immunity. The Court reasoned that absolute prosecutorial immunity requires that the prosecutor's activities be "intimately associated with the judicial phase of the criminal process," quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. at 995, and that "advising the police in the investigative phase of a criminal case" cannot be so characterized. 500 U.S. at 493, 111 S.Ct. at 1943.

The Court returned to the proper boundaries of absolute prosecutorial immunity in *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). This

was a § 1983 case against state police officers and prosecutors arising out of the incarceration of a suspect in a highly publicized child murder case. The conduct complained of consisted of the fabrication of false evidence by police and assistant prosecutors, and false statements the county prosecutor made about plaintiff at a press conference (shortly before election day) announcing plaintiff's arrest and indictment. The fabrication of evidence occurred while "police officers and assistant prosecutors were performing essentially the same investigatory functions," at a time when there was insufficient evidence "to support [plaintiff's] (or anyone else's) arrest," *id.* at 262–63, 113 S.Ct. at 2610.

The Court held that absolute immunity was inapplicable to all aspects of the prosecutors' conduct. The county prosecutor's statements to the media were not entitled to absolute immunity in the absence of any common-law immunity to that effect, and because, under *Imbler,* such comments had no functional tie to the judicial process. 509 U.S. at 276–78, 113 S.Ct. at 2617–18. That holding is not germane to the case at bar. As for the evidence-creating joint venture between police and prosecutors, the Court rejected plaintiff's contention that a prosecutor's absolute immunity extended no father than the initiation of a prosecution and conduct in the courtroom. *Imbler* itself foreclosed so narrow a construction, since the Court there noted that "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom" which are nonetheless entitled to absolute immunity. *Buckley* at 509 U.S. 272, 113 S.Ct. 2615, quoting *Imbler* at 424 U.S. 431, n. 33, 96 S.Ct. 995, n. 33. And the *Buckley* Court said that *Burns* did not signal a retreat

from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its

presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Id.* at 273, 113 S.Ct. at 2615.

But the prosecutors' cooperative efforts with the police in *Buckley* did not qualify for absolute immunity because they related solely to an investigation, at a time when there was insufficient evidence to arrest anyone. The Court stressed that factor at 509 U.S. 274, 113 S.Ct. 2616:

The prosecutors do not contend that they had probable cause to arrest petitioner or to initiate judicial proceedings during that period. Their mission at that time was entirely investigative in character. A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.

(footnote omitted)

In the case at bar, and in contrast to both *Burns* and *Buckley,* the FBI had arrested Lavin on suspicion of bank fraud before Wales entered into any of his challenged interaction with Thornton. Lavin's arrest was based upon a painstaking investigation which Judge Keenan described in detail in his suppression decision at slip op. 3–6. Lavin does not, and could not, argue that there was no probable cause for his arrest on March 12. Moreover, the strength of the surveillance evidence against him made his indictment for bank fraud and the use of unauthorized access devices inevitable.

In these circumstances, I must decide whether, in the light of the principles articulated in *Imbler, Burns* and *Buckley,* a prosecutor's absolute immunity applies to the conduct of AUSA Wales. I conclude that it does.

It may not be possible to derive from these cases a bright-line delineation between prosecutorial pre-trial conduct that is absolutely immune and conduct that is not. But I think it entirely plain that where, as here, a police investigation in which the prosecutor has played no part leads to an arrest, and that prosecutor is preparing to submit the case to the grand jury, his communications with the police about the collection and evaluation of

evidence are "intimately associated with the judicial phase of the criminal process," as that phrase is used in Imbler. The case at bar bears no meaningful resemblance to a prosecutor advising the police about how to conduct their investigation in the first place, or whether they have probable cause for an arrest, as in Burns; or to a prosecutor's participation in a police investigation before probable cause exists to arrest anyone, as in Buckley.

Thus it matters not whether Wales's advice to Thornton was proper or even lawful, a question upon which I express no view. In any event, Wales's conduct is absolutely immune from a suit for money damages. Any other conclusion, in circumstances such as these, would inhibit prosecutors in the performance of their duties to a degree recognized by the Supreme Court in Imbler as the policy reason for a prosecutor's absolute immunity.

### (b) Qualified Immunity

On this aspect of the case, where agent Thornton moves for summary judgment on the ground of her qualified immunity from suit, I must view the evidence in the light most favorable to plaintiff, the nonmoving party.

Specifically, I must accept as true the testimony of the senior Lavins that on March 12, during the first of the agents' three visits to the home, Thornton discovered and removed a rifle and a shotgun belonging to plaintiff, explaining as she did so that plaintiff was a "convicted felon" and had no right to possess firearms. See testimony of Mary Lavin, Tr. 433–34; Louis Lavin, Tr. 500. I must also draw plaintiff's requested factual inference that in making that statement, Thornton sought to mislead the Lavins. The inference is based on the conceded fact that, prior to his guilty plea to the bank fraud count in this case, plaintiff had not been convicted of a felony.

It is also the fact that neither Mary nor Louis Lavin objected to the agents' removal of plaintiff's firearms, either on March 12 or on the subsequent March 13 and March 16 visits, when additional weapons were seized.

The decisive question in the case is whether qualified immunity applies to Thornton's conduct in seizing plaintiff's firearms in the manner described by his parents, after having obtained consents in the forms introduced at the suppression hearing before each of the three searches.

Qualified or "good faith" immunity is an affirmative defense that must be pleaded and proved by a defendant official. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Government officials performing discretionary functions "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because the test is what "a reasonable person would have known," the qualified immunity defense "turn[s] primarily on objective factors." *Id.* at 819, 102 S.Ct. at 2738. The trial judge must consider "not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Id.* at 818, 102 S.Ct. at 2738 (footnote omitted).

Applying these criteria to the case at bar, I conclude that agent Thornton, having received from Louis Lavin broadly worded search consent forms, never subsequently withdrawn or limited, which entitled the agents to take from the Lavin home "any letters, papers, materials or other property which they may desire," did not violate any of plaintiff's clearly established constitutional rights by seizing his firearms and certificates of title, even if (which I assume for the sake of the analysis) no independent lawful cause existed for seizure of those items.

It is well settled that a search conducted pursuant to consent is not subject to the Fourth Amendment's requirements of a warrant and probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). However, the consenting party may limit the scope of the search or seizure he has authorized in the same way that the particularity requirement of a warrant restricts the areas to be

searched and the items to be seized. *Florida v. Jimeno,* 500 U.S. 248, 252, 111 S.Ct. 1801, 1804, 114 L.Ed.2d 297 (1991); *United States v. Dichiarinte,* 445 F.2d 126, 130 n. 3 (7th Cir.1971). A search conducted outside the scope of actual consent, and without a warrant or probable cause, is unreasonable and violates the Fourth Amendment. *See Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803; *Dichiarinte,* 445 F.2d at 128.

In the case at bar, it is common ground that Agent Thornton had neither a warrant nor probable cause to seize Lavin's firearms and certificates of title. Accordingly, the central issue in determining whether Lavin's firearms and certificates of title were seized in violation of his constitutional rights is whether the seizure fell within the scope of the elder Lavins' consent. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803; *see also United States v. Evans.,* 27 F.3d 1219, 1231 ("A person's conduct can be indicative of the scope of a consensual search.").

Based on the consent forms and the circumstances surrounding their execution, I conclude that a reasonable person would have interpreted the Lavins' consent as extending to the seizure of the property at issue. On the point at issue, the consent forms signed by Louis Lavin could not have been more broad. Although handwritten annotations on the form limited the physical areas within the house where the agents could search, there was no limit on the items that could be seized from those areas.[3] *Cf. Altom v. United States,* 454 F.2d 289, 290–91 (7th Cir.1971), *cert. denied,* 406 U.S. 917, 92

S.Ct. 1765, 32 L.Ed.2d 116 (1972) (in response to defendant's objection to language of consent form authorizing agents to seize any property "they may desire," agents crossed out language in favor of detailed list of items).

In addition, there is no evidence that the elder Lavins revoked or limited their consent subsequent to signing the forms. *see United States v. Covello,* 657 F.2d 151, 155 (7th Cir.1981) (holding that the defendant "never expressly revoked his consent, and the signed form [identical to the forms signed by Louis Lavin] indicates his initial consent was not narrow ...."); *cf. United States v. Bily,* 406 F.Supp. 726, 728–29 (E.D.Pa.1975) (holding that defendant's statement—"That's enough. I want you to stop."—immediately revoked consent to agents' seizure of any "property which they may desire"). Moreover, neither Mary nor Louis Lavin objected to the seizure of the firearms or the certificates of title. *See United States v. Perez,* 948 F.Supp. 1191, 1201 (S.D.N.Y.1996) (holding that agents reasonably believed that consent extended to items seized since defendant's father reviewed the items to be seized, did not object to the seizure of the items, and signed a receipt); *United States v. Gazzara,* 587 F.Supp. 311, 328 (S.D.N.Y.1984) (holding that consent to seizure of evidence in the nature of contraband or counterfeit currency extended to address books "[g]iven the broad language of the form ... and the fact that she at no time objected to seizure of the books...."). In short, nothing in the record suggests that Louis Lavin "intended his consent ... to be narrower than that which appears on the consent form." *Evans,* 27 F.3d at 1231 (upholding search and seizure based on consent form identical to the form signed by Louis Lavin); *see also United States v. Reeves,* 6 F.3d 660 (9th Cir.1993).[4]

---

3. The exact language of the consent form bears repeating at this stage: "These agents are authorized by me to take from my premises any letters, papers, materials or other property which they may desire."

4. *Cf. United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971). In *Dichiarinte,* a warrant was issued for the defendant's arrest on an indictment charging him with the sale of narcotics. *Id.* at 128. At the time of the defendant's arrest,

federal agents asked whether he had any narcotics in his home. *Id.* The defendant responded, "I have never seen narcotics. You guys come over to the house and look, you are welcome to." *Id.* During the course of the search, the agents seized several currency exchange receipts. *Id.* At that point the defendant called off the search, commenting, "Does that look like narcotics if that is what you want to search for?" *Id.*

Despite the defendant's statements, the agents seized the currency receipts and other financial

Given the absence of any limiting factors, and the fact that the consent form allowed the agents to seize whatever "they may desire," it was reasonable for Agent Thornton to believe that the elder Lavins had consented to the seizure of Kevin Lavin's firearms and certificates of title.[5] In light of this broad consent, the agents were not required to establish probable cause or any other independent lawful justification for the seizure. *See Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043. Accordingly, Agent Thornton's conduct did not violate any clearly established constitutional rights and she is shielded from any liability for civil damages by qualified immunity.

This analysis applies with equal force to AUSA Wales. Agent Thornton seized the property at issue only after receiving authorization from Wales. Although the record does not indicate the substance of their conversation, it is reasonable to assume that Agent Thornton explained to Wales that the Lavins had signed the standardized consent form. As discussed above, the consent form authorized the seizure of Lavin's firearms and certificates of title, even in the absence of probable cause. Thus, even if Wales is not absolutely shielded from suit, summary judgment in his favor is warranted on the ground of qualified immunity.

### Conclusion

For the foregoing reasons, the defendants are entitled to summary judgment on the ground that they are immune from plaintiff's civil action for money damages. The Clerk of the Court is directed to enter judgment dismissing plaintiff's complaint against each defendant with prejudice.[6]

It is SO ORDERED.

documents. *Id.* The defendant was subsequently charged with and convicted of tax evasion, after the District Court found that the financial documents were seized pursuant to a valid consent search. *Id.* The Seventh Circuit reversed, holding that the defendant's consent had been limited to a search for narcotics. *Id.* at 129. Since the financial documents were outside the scope of the defendant's limited consent, and the agents had no independent lawful basis to seize the documents, the Seventh Circuit vacated the conviction. *Id.* at 130–31; *see also United States v. Cucci*, 892 F.Supp. 775, 794 (W.D.Va.1995).

5. According to my research, the standardized consent form signed by Louis Lavin has been used continuously by federal law enforcement agents since at least 1947. *See In re Fried*, 161 F.2d 453, 455, 457 (2d Cir.1947) (holding that consent pursuant to form was voluntary); *see also Rees v. Peyton*, 341 F.2d 859, 862–63 (4th Cir.1965) (holding that the search and seizure conducted pursuant to consent form were "altogether without legal infirmity."); *United States v. Fitzpatrick*, 289 F.Supp. 767, 769 (D.Utah 1968) (holding that defendant's execution of standardized consent form was voluntary); *United States v. Willis*, 473 F.2d 450, 451 & n. 1 (6th Cir.), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) (same); *United States v. Bily*, 406 F.Supp. 726, 728–29 (E.D.Pa.1975) (same); *United States v. Prescott*, 480 F.Supp. 554, 558 n. 4, 559 (W.D.Pa.1979) ·(same); *United States v. Covello*, 657 F.2d 151, 153 (7th Cir.1981) (reversing

suppression order and remanding to district court for further· factfinding on circumstances surrounding defendant's execution of consent form); *United States v. Ramirez*, 963 F.2d 693, 704–05 (5th Cir.), *cert. denied*, 506 U.S. 944, 113 S.Ct. 388, 121 L.Ed.2d 296 (1992) (holding consent voluntary); *United States v. Evans*, 27 F.3d 1219, 1224 n. 1, 1230–31 (7th Cir.1994) (holding that search and seizure was within broad scope of consent form); *United States v. Perez*, 948 F.Supp. 1191, 1196, 1202 (S.D.N.Y.1996) (same); *but see Gentile v. United States*, 419 U.S. 979, 95 S.Ct. 241, 42 L.Ed.2d 191 (1974) (Douglas, J., dissenting), *denying cert. to*, 493 F.2d 1404 (5th Cir.1974) (dissenting from the denial of certiorari in part because boiler plate consent to search forms circumvent important protections of warrant procedure such as probable cause and particularity); *United States v. Fisher*, 329 F.Supp. 630, 633 (D.Minn.1971) (holding that defendant's execution of standardized consent form was not voluntary); *Bolger v. United States*, 189 F.Supp. 237, 244, 252–53 (S.D.N.Y.1960) (same). The apparent longevity of this consent form is not insignificant in the context of determining whether Agent Thornton reasonably believed that she could seize Lavin's firearms on the basis of the consent form, and in the absence of probable cause, without violating his constitutional rights.

6. Plaintiff has asked for leave to file and serve a surreply brief. I deny that application in the exercise of my discretion because the governing law requires this summary disposition.